No. 53,214

THE DENISON STATE BANK, *Appellant,* v. C. C. MADEIRA and DAR-
LENE M. MADEIRA, *Appellees.*

(640 P.2d 1235)

Opinion filed February 27, 1982.

*Earnest Vincent Pease, Jr.,* of Pease and Lewis, of Topeka, argued the cause and *Michael L. Lewis,* of the same firm, was with him on the brief for appellant.

*Lawrence P. Ireland,* of Ireland, Enright & Baird, of Topeka, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

HOLMES, J.: This appeal involves an action originally filed by The Denison State Bank (the Bank) to recover on three promissory notes executed by the defendant C. C. Madeira and guaranteed by his wife, the defendant Darlene M. Madeira, and a counterclaim filed by the defendants against the Bank alleging breach of a fiduciary duty. In a jury trial the Bank was denied recovery on the promissory notes and the jury returned a verdict for the defendants for $25,000.00 on their counterclaim. The Bank appeals. We reverse. It is necessary that the facts be set forth in some detail.

In July, 1978, the defendant C. C. Madeira, age 49, an experienced businessman, ran a classified advertisement in Automotive

News, a national publication, seeking to invest in an automobile dealership which was in need of finances and management expertise. The advertisement indicated Madeira wanted to buy into, buy out, or enter into a partership relationship involving such a dealership. Tom King had just what Mr. Madeira appeared to be seeking. King was the owner and operator of a General Motors dealership in Holton, Kansas, known as Tom King Pontiac-Buick-GMC Trucks (King agency) which was in serious financial straits due largely to a lack of management and the generally depressed condition of the retail automobile and truck industry. King saw the Madeira advertisement in the Automotive News, contacted Mr. Madeira and made arrangements to fly in his private airplane to Elgin, Illinois, Madeira's home, for a meeting. Things progressed and King brought Madeira to Holton to look over the dealership, and the community so he could determine whether he might be interested in investing in Tom King's business. On his first visit to Holton, Madeira was introduced by King to officials of The Denison State Bank. King did business at the Bank and obtained his new car floor plan and other financing through the Bank. King was heavily indebted to the Bank and the officers of the Bank were aware of his financial difficulties. Thereafter things proceeded rather rapidly. Madeira made at least two trips to Holton during August and on both occasions met with the Bank officials about his possibility of investing in the King agency. He had $50,000.00 available and hoped to obtain an additional $100,000.00 through a Small Business Administration loan. Mr. Madeira was interested in establishing a line of credit with the Bank and talked primarily with Mr. Sheldon Hochuli, a vice-president. Mr. Madeira testified that he had full access to the financial records of the King agency and at Madeira's specific request consulted with King's certified public accountants about the financial condition of the agency. As King and Madeira appeared to be making progress, Madeira inquired of Mr. Hochuli about an attorney who might represent him. Mr. Hochuli recommended Marlin White who also represented Tom King and who represented the Bank on occasions. Mr. Madeira expected Mr. White to be protecting his interests in the transaction. White testified he represented both King and Madeira in the transaction and that he was also interested in protecting the interests of the Bank, as he represented it on numerous matters.

On the occasions that Madeira talked with Mr. Hochuli, they discussed establishing a line of credit for Mr. Madeira, the possibility of obtaining an SBA loan, and King's financial situation, including his obligations to the Bank, among other things. The defendants contend that Mr. Hochuli, acting on behalf of the Bank, failed to disclose certain financial matters involving the King agency which affected the Bank's status as a major creditor of the King agency.

It is the contention of the defendants that a fiduciary relationship had been established between the Bank and Mr. Madeira which was breached by the Bank when it did not make a full disclosure of the financial involvement of King with the Bank. There is no contention that Mr. Hochuli made any affirmative false representations about King's indebtedness to the Bank, but it is contended that certain financial information was withheld when the Bank was under a fiduciary duty to disclose the same. The information included $15,000.00 of outstanding drafts for automobiles, a $5,000.00 overdraft in Mr. King's checking account and the alleged failure to disclose that certain anticipated rebates to be paid by General Motors Corporation in December of 1978 were already pledged to one Kenneth P. Tate of Oklahoma and to the Bank. It is the policy of General Motors, as with other major car manufacturers, to pay an annual rebate to its dealers for each new unit sold by the dealership during the year and for each unit carried over into the new model year. This can amount to several thousands of dollars and Madeira asserted he understood these rebates would be available to repay part of the initial $50,000.00 loan he was going to put into the business. In July, 1978, King was having trouble with General Motors Acceptance Corporation, the credit arm of General Motors, because he had failed to remit certain trust funds to the Corporation which became due upon the sale of automobiles and trucks. King had previously negotiated a loan from his uncle, Kenneth P. Tate, and in an attempt to protect Tate, King executed an assignment and financing statement pledging the rebates to Tate as security for the loan. The financing statement was filed of record in the Jackson County Register of Deeds office on July 24, 1978. One day later, King executed a similar financing statement to the Bank as additional security for his indebtedness there. Both financing statements were a matter of public record prior to the time Mr.

Madeira first came to Holton. King evidently neglected to tell Madeira about the pledges of the rebates and Mr. White, Madeira's attorney, also failed to discover or disclose them.

By late August King and Madeira had come to terms and they sought out Mr. White to reduce their agreement to writing. The agreement was prepared and then signed on September 5, 1978. On that date Madeira brought the agreement to the Bank and went over it with Mr. Hochuli. The agreement recited, inter alia, that King needed financial and managerial assistance; that Madeira had the necessary managerial expertise; that Madeira would loan King $50,000.00 "for payment of certain outstanding obligations now due"; that Madeira would secure an additional $100,000.00 loan (presumably the SBA loan); that Madeira would receive a salary of $2,000.00 per month and King not more than $3,000.00 per month with any additional profits in any calendar year being split between the parties after Madeira was paid an amount sufficient to equalize his salary with that of King. Madeira was to be the general manager and have control of the business and was granted a security interest in the assets of the business. The agreement provided for the payment of expenses on King's airplane, the assignment from King of certain real property interests together with a provision for Madeira to receive 51% of the King agency. The provisions relative to the General Motors rebates read:

"First party [King] further assigns any rebates on new car sales or reimbursements for carry over stock that might be due him unto second party [Madeira] as additional security. Any amounts paid on said rebates or reimbursements shall be directly credited against the initial loan of Fifty Thousand ($50,000.00) Dollars being made by second party."

Finally the agreement provided Madeira would not be responsible for any of King's existing debts and that Madeira would control the use of any additional funds he might put into the business.

Defendants' primary contention is that Mr. Hochuli, on behalf of the Bank, breached a fiduciary duty between the Bank and defendants when he failed to inform defendants that the General Motors rebates were already pledged to Tate and the Bank. Defendants contend that Mr. Hochuli examined the agreement with Madeira prior to its execution by Madeira. A careful review of the transcript reveals that the evidence, when construed most

favorably to Madeira, only reveals that Mr. Hochuli saw the agreement on September 5, 1978. It is inconclusive as to whether Madeira had already signed the agreement at that time. The evidence further revealed that the $15,000.00 in drafts due the Bank were for automobiles delivered to the dealership and that the $5,000.00 King overdraft was not an unusual business occurrence due to the nature and size of the business activity being carried on between King and the Bank. At any rate, the overdraft, the automobile drafts and the secured indebtedness due Tate and the Bank were all items which should properly be reflected in any examination of the records of the King agency.

It is the position of the Bank that it fully answered all inquiries made by Madeira and while Mr. Hochuli did not expressly advise defendant of the pledge of the General Motors rebates, he testified that he understood that Madeira was fully aware of the extent and nature of the indebtedness of King to the Bank, the security held by the Bank, and the extent of the financial obligations of the King agency. Mr. Hochuli testified that he knew King had given Madeira access to the records of the agency; he knew Madeira had consulted with King's accountants and he knew Madeira had independent counsel in Mr. White. He also testified he knew Mr. Madeira was relying on the Bank officers to be fair and honest with him and they had been. Madeira, on the other hand, testified he felt he was misled not only by King but by the Bank. In November, 1978, King and Madeira entered into another agreement in which Madeira had an option to become the owner of the business upon certain terms and conditions including the assumption of the indebtedness reflected by the security agreements held by both Tate and the Bank. Operating under such agreement, Madeira eventually assumed all of King's obligations to the Bank and King was relieved of all liability thereon. By the spring of 1979, it was apparent that Madeira could not make a go of the King agency and it was voluntarily liquidated in an attempt to pay the financial obligations of the business.

Plaintiff Bank filed this action to recover the balance due on three promissory notes executed by Madeira and guaranteed by his wife. The defendants counterclaimed for actual and punitive damages alleging the notes were fraudulently obtained by the Bank at a time when the Bank occupied a fiduciary relationship to the defendants. The question before this court is whether the

factual situation herein created a fiduciary relationship and if so, whether the Bank fraudulently breached its fiduciary duty to the defendants?

Appellant asserts three points on appeal: (1) error by the trial court in overruling plaintiff's motion for a directed verdict on defendants' counterclaim; (2) error by the trial court in overruling plaintiff's motion for a directed verdict on plaintiff's claim against the defendants, and (3) error in the jury instructions. At the outset it may be pointed out that the defendant C. C. Madeira did not deny executing the promissory notes and the defendant Darlene M. Madeira did not deny executing a separate guarantee for her husband's indebtedness. It is also not disputed that if the plaintiff Bank was entitled to recover on the notes then the balance due as of the date of trial was $51,984.75. The notes which were signed by Madeira were dated January 29, 1979, February 15, 1979, and April 4, 1979, and were all in default at the time suit was filed. Defendants based their defense and counterclaim upon six alleged wrongful acts of the Bank constituting a breach of fiduciary duty on or prior to September 5, 1978. The six acts complained of were set forth in the instructions as follows:

"1. That the plaintiff bank made untrue representations of fact regarding the ability of the defendant to obtain an SBA loan and the plaintiff's ability to assist the defendant in obtaining the same.

"2. That the plaintiff bank intentionally failed to disclose to the defendants the bank's knowledge that a financing statement filed by one Kenneth P. Tate [sic] rebates were assigned to the said Kenneth P. Tate.

"3. That the plaintiff bank intentionally failed to disclose to the defendants that the plaintiff itself had also filed a financing statement running to said bank of said rebates.

"4. That plaintiff bank intentionally failed to disclose to the defendants prior to signing of the 1978 agreement between Tom King and defendant C. C. Madeira the bank's knowledge that there were approximately $15,000.00 in drafts outstanding at the time the agreement was signed and entered into which was due and payable.

"5. That the plaintiff bank intentionally failed to disclose prior to the signing of the August, 1978 agreement the fact that Tom King had an overdraft in the amount of approximately $5,000 due and owing to bank plaintiff.

"6. That Denison State Bank did intentionally fail to disclose to the defendants that they themselves were concerned and worried about the status of their loan to Tom King."

As previously indicated the jury found for the defendants on their counterclaim for $25,000.00 actual damages. No punitive damages were allowed and, as instructed by the court, the Bank,

having been found liable on the counterclaim, was denied any recovery on the promissory notes. In considering appellant's first two points on appeal, the standard of review in this court was recently stated in *Simpson v. Davis,* 219 Kan. 584, 549 P.2d 950 (1976), as:

"In ruling on a motion for a directed verdict pursuant to K.S.A. 60-250, the court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought, and where the evidence is such that reasonable minds could reach different conclusions thereon, the motion must be denied and the matter submitted to the jury. (*Tos v. Handle,* 209 Kan. 139, 495 P.2d 896, and *Fox v. Massey-Ferguson, Inc.,* 206 Kan. 97, 476 P.2d 646.) The same basic rule governs appellate review of a motion for a directed verdict. (*Apperson v. Security State Bank,* 215 Kan. 724, 732-733, 528 P.2d 1211; and *Bendure v. Great Lakes Pipe Line Co.,* 199 Kan. 696, 433 P.2d 558.)" p. 589.

The determination of what constitutes a fiduciary relationship has been before this court on numerous occasions. *Dugan v. First Nat'l Bank in Wichita,* 227 Kan. 201, 606 P.2d 1009 (1980); *Ford v. Guarantee Abstract & Title Co.,* 220 Kan. 244, 553 P.2d 254 (1976); *Wolf v. Brungardt,* 215 Kan. 272, 524 P.2d 726 (1974); *Lindholm v. Nelson,* 125 Kan. 223, 264 Pac. 50 (1928). It may be said that generally there are two types of fiduciary relationships: (1) those specifically created by contract such as principal and agent, attorney and client, and trustee and cestui que trust, for example, and those created by formal legal proceedings such as guardian and/or conservator and ward, and executor or administrator of an estate, among others, and (2) those implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions. The determination of the existence of a fiduciary relationship of the first category, though not without problems on occasion, is usually relatively simple. The second category, with which we are faced in this case, becomes much more difficult to determine and must depend upon the facts in each case. In *Curtis v. Freden,* 224 Kan. 646, 585 P.2d 993 (1978), this court stated:

"Whether or not a confidential or fiduciary relationship exists depends on the facts and circumstances of each individual case. This court has refused, for that reason, to give an exact definition to fiduciary relations." p. 651.

The concept of the fiduciary duty is an equitable one and while no precise definition may be given and strict parameters of the relationship cannot be established for use in all cases, there are certain broad general principles which should be considered in

making the determination of whether a fiduciary relationship exists in any particular factual situation.

A fiduciary relationship imparts a position of *peculiar confidence placed by one individual in another.* A fiduciary is a person with a duty to *act primarily for the benefit of another.* A fiduciary is in a position to have and exercise, and does *have and exercise influence over another.* A fiduciary relationship implies a condition of *superiority of one of the parties over the other.* Generally, in a fiduciary relationship, the property, interest or authority of the other is *placed in the charge of the fiduciary.* See generally, 36A C.J.S., Fiduciary, p. 381 *et seq.*

"Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded, and have refused to set any bounds to the circumstances out of which a fiduciary relation may spring.

. . . .

"[I]t extends to every possible case in which a fiduciary relation exists in fact, and in which there is *confidence reposed* on one side *and resulting domination and influence* on the other." pp. 385, 386-7. (Emphasis supplied.)

In an old Indiana Appellate Court case, we find some definitive elements which may be relevant in determining whether a fiduciary relationship exists.

"There is no invariable rule which determines the existence of a fiduciary relationship, but it is manifest in all the decisions that there must be not only confidence of the one in the other, but there must exist a certain inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of the facts involved, or other conditions, *giving to one advantage over the other." Yuster v. Keefe,* 46 Ind. App. 460, 466, 90 N.E. 920 (1910).

The same principle was followed in *Koenig, Receiver etc. v. Leas,* 240 Ind. 449, 165 N.E.2d 134 (1960). In *Koenig* the dispute arose from dealings involving an automobile agency and the court found that the one claiming to have been misled should not have been surprised that the business deal was "no bed of roses." The very fact of the underlying consultation should have put him on notice.

In *Lindholm v. Nelson,* 125 Kan. 223, the court held:

"A fiduciary relation does not depend upon some technical relation created by, or defined in, law. It may exist under a variety of circumstances, and does exist in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence." Syl. ¶ 3.

The court went on to state in the opinion:

"The courts have consistently refused to give an exact definition to, or to fix definite boundaries of, that class of human relations which, by principles of common honesty, require fair dealing between the parties, and which is commonly known as fiduciary relations.

. . . .

" 'Where the transaction is in its nature and circumstances such as to give one party an inequitable or unconscionable advantage over the other, equity, inferring fraud, will not only decline to lend its aid to the party seeking to enforce such claim, but will often actively interfere to give relief to the other party.' " p. 232.

In *Wolf v. Brungardt,* 215 Kan. 272, the court cited *Reeder v. Guaranteed Foods, Inc.,* 194 Kan. 386, 399 P.2d 822 (1965), and *Jenkins v. McCormick,* 184 Kan. 842, 339 P.2d 8 (1959), which said:

"Where one party to a contract or transaction has superior knowledge, or *knowledge which is not within the fair and reasonable reach of the other party and which he could not discover by the exercise of reasonable diligence,* or means of knowledge which are not open to both parties alike, he is under a legal obligation [in essence, fiduciary] to speak, and his silence constitutes fraud, especially when the other party relies upon him to communicate to him the true state of facts to enable him to judge of the expedience of the bargain." p. 282. (Emphasis added.)

The court also went on to say that a futile investigation would not be required of a defrauded party if an investigation would not reveal the true facts anyway. Such is not the case before this court.

While the foregoing general principles are not meant to be all inclusive and certainly need not all be present in any particular case, they are representative of the various factors and rules of law which may be considered by a court in determining whether a fiduciary or confidential relationship does, in fact, exist. In light of such general principles do the facts in this case support a finding that The Denison State Bank occupied a fiduciary relationship in its dealings with the defendants? We think not.

Much is made of the defendants' third allegation of wrongful acts by the Bank to the effect that the Bank concealed the fact that the General Motors rebates had been pledged to the Bank as partial security for King's indebtedness. Counsel for defendants at the pretrial conference stated:

"We do not allege on behalf of the defendants, Madeira, that they were not aware of the prior security interests in the Denison State Bank, because they were informed of that. We do not allege that. In other words, we allege that the only one that we didn't know about and that was concealed from us was the one to Kenneth Tate."

Counsel's statement was made a part of the pretrial order which also provided:

"This pretrial order shall supersede all pleadings, shall control the subsequent course of this case and shall not be modified except by consent of the parties with court approval or by order of the Court on its own motion to prevent manifest injustice."

There was no subsequent modification of the pretrial order.

Items (4) and (5) complained of by the defendants concerned certain outstanding drafts due the Bank and an overdraft in King's checking account. The outstanding drafts were for automobiles delivered to the King agency under its floor plan with the Bank and represented automobiles which were assets of the business. The checking account overdraft appears to have developed over the weekend preceding the signing of the King-Madeira agreement on Tuesday, September 5, 1978, Monday having been a holiday. It appears clear that due to the nature and extent of the business relationship, the overdraft was not an unusual occurrence. Both items (4) and (5) should have been readily apparent from an examination of the King agency records and, in addition, Madeira knew King was overextended and heavily indebted to the Bank which was interested in protecting its own interest.

Proof of any untrue representations by the Bank about the availability of the SBA loan [alleged wrongful act (1)] was minimal at best. The allegation in item (6) that representatives of the Bank failed to disclose they were concerned about the status of their loan to Tom King is insufficient to establish fraud or a violation of a fiduciary relationship when Madeira knew the King agency was heavily in debt, principally to the Bank. Obviously, the Bank would be concerned. Mr. Madeira readily conceded that he knew King was heavily indebted to the Bank, that the major agency assets were pledged to the Bank and as disclosed by the pretrial order, he was aware of the pledge of the General Motors rebates. The real crux of the defendants' complaints about their treatment by the Bank is the alleged failure of the Bank to disclose that it had knowledge of the July 24, 1978, assignment of the General Motors rebates to Kenneth P. Tate. The record discloses that at the time the Bank took an assignment of the rebates on July 25, 1978, it had no knowledge of the prior assignment to

Tate. It discovered the fact upon making a routine check of the Jackson County records. Such information was equally available to Madeira and his legal counsel.

In the instant case, we are not faced with a situation where a party with superior knowledge used that knowledge to its own benefit to the detriment of the other party who occupied an inferior position with the knowledge, expertise or ability to ascertain the true facts. Mr. Madeira held himself out in a national automotive publication to be one who had expertise in the automobile agency business. He was a knowledgeable businessman both by education and experience. He had full access to the King agency records and consulted independent counsel in addition to the agency accountants. It was Mr. Madeira who insisted that King's accountants be brought in to go over the records with him. He sought and found a dealership that he knew was in financial difficulty and, having done so, should have exercised some degree of diligence to assure himself that he was fully informed as to the extent of such difficulty. The defendant freely admits that he was fully aware of the pledge of the rebates to Tate when he entered into the second agreement with King in November, 1978. Thereafter, he agreed to the renewal of King's indebtedness, to assume the responsibility therefor and to allow King to be relieved of all liability thereon. At one time his liability to the Bank approached $260,000.00, all incurred after he had full knowledge of the Tate assignment. Presumably he received the General Motors rebates in 1978, and paid them over to Tate. He continued to do business with the Bank and even at the time of the liquidation of the business, bought two of the agency automobiles and financed them on favorable terms at The Denison State Bank. None of Mr. Madeira's actions appear to have been consistent with those of one who thought he had been defrauded by the Bank.

In *Dugan v. First Nat'l Bank in Wichita,* 227 Kan. 201, we stated:

"Kansas recognizes the general rule that the relationship between a bank and its depositor is that of creditor-debtor and not of a fiduciary. [Citations omitted.]" p. 207.

The facts of this case do not take it out of the general rule and are insufficient to support a finding of a fiduciary relationship. Mr. Madeira came to Holton looking for a financially distressed

business, or as stated in *Koenig,* one that was "no bed of roses," and having found one, sought to establish a local banking connection. Being aware of the extensive indebtedness to the Bank, he desired to maintain that Bank's relationship with the business. He knew the Bank stood to benefit by any influx of capital he might put into the business and no affirmative financial misrepresentations are alleged to have been made by representatives of the Bank. The facts which the defendant contends were concealed from him were either a matter of public record or were otherwise readily available if some reasonable effort had been made to ascertain them.

We conclude under the facts of this case that one in the position of Mr. Madeira cannot avoid the responsibility of exercising reasonable diligence for his own protection by relying upon his bank to provide him with information which was not specifically requested and which was otherwise readily available. To adopt such a standard would put an intolerable obligation upon banking institutions and convert ordinary day-to-day business transactions into fiduciary relationships where none was intended or anticipated. Mr. Madeira did testify that he trusted and relied upon the Bank to furnish him complete, honest information. However, one may not abandon all caution and responsibility for his own protection and unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held liable as a fiduciary. This is particularly true when one, such as Mr. Madeira, is fully competent and able to protect his own interests. The finding of a fiduciary relationship between the Bank and Mr. Madeira is not supported by substantial competent evidence. Neither is there clear and convincing evidence to establish fraud on the part of the Bank absent the existence of a fiduciary relationship. See *DuShane v. Union Nat'l Bank,* 223 Kan. 755, 576 P.2d 674 (1978).

It follows that the court erred in failing to sustain plaintiff's motions for a directed verdict on its claim against the defendants and on the counterclaims of the defendants. In view of the foregoing, plaintiff's assertion of error in the jury instructions need not be considered.

The judgment in favor of the defendants on their counterclaim is reversed and the case is remanded with instructions to enter judgment in favor of the plaintiff and against the defendants for the undisputed amount due on the promissory notes.