Robert E. MARSH *v.* NATIONAL BANK OF COMMERCE of El Dorado, Arkansas; Jerry M. Wilson; Nadelle S. Wilson; Ralph Jackson Vines; Jo E. Vines; and Gurvis F. Vines

CA 91-239                                    822 S.W.2d 404

Court of Appeals of Arkansas
En Banc
Opinion delivered January 29, 1992
[Rehearing denied February 26, 1992.*]

---

*Rogers, J., would grant rehearing; Mayfield, J., not participating.

*Wilson & Associates*, by: *Jack T. Lassiter*, for appellant.

*William I. Prewett*, for appellees.

JOHN E. JENNINGS, Judge. On January 29, 1988, Jerry and Nadelle Wilson and Ralph and Jo Vines executed a promissory note to National Bank of Commerce of El Dorado for $245,000.00. Gurvis Vines and Robert Marsh signed the note as guarantors. On March 8, 1989, Jerry Wilson, Ralph Vines, and Robert Marsh signed a second note to the bank for $17,600.00 to cover accrued interest on the first note. After both notes went into default, the bank sued and obtained judgment against the parties in Union County Chancery Court on November 7, 1990. Robert Marsh appeals.

The primary issue is whether the chancellor erred in not holding that the bank's claim against Marsh was barred under section 124(1) of the Restatement of Security, dealing with the non-disclosure of material facts by a creditor to a surety, as expressly adopted by the Arkansas Supreme Court in *Camp* v. *First Fin. Fed. Sav. and Loan Ass'n*, 299 Ark. 455, 772 S.W.2d 602 (1989). More specifically, Marsh contends that the bank's failure to disclose the status of a note owed by his co-guarantor, Gurvis Vines, bars the claim. We hold that the question was one of fact and that the chancellor's decision was not clearly wrong. Ark. R. Civ. P. 52(a). Because we find no error, the trial court's judgment is affirmed.

Some history is necessary for an understanding of the issues presented. Jerry Wilson is the pastor of a Baptist church in El Dorado. He has also been in the business of buying real estate to renovate or rent. In 1983 he bought forty-one acres of land in Union County, for development purposes, financed by an $85,000.00 loan from the appellee bank and secured by a purchase money mortgage on the land. When the note fell due in 1986 and he could not pay it, Wilson called Robert Marsh, who was then the president of Ensco, Inc., to see if either Marsh or Ensco might buy the property. Although Marsh was not interested in buying the land, he agreed to help.

In September 1986, Marsh guaranteed a new one-year note for $120,000.00 made by Wilson and his wife, Nadelle, to the bank. When this note came due, Wilson again could pay neither principal nor interest. Marsh paid the $13,000.00 in interest due and the bank extended the note another year.

Before the note fell due again, Gurvis Vines, a member of Pastor Wilson's congregation, became concerned about Wilson's financial burdens and proposed a solution. Vines had been in the insurance business in El Dorado for many years and was also an independent oil producer, operating under the name of Jay Mike Oil Company. Vines also had a long standing relationship with James Cook, the president of the bank since 1969.

Vines had an interest in several idle, but potentially oil-producing, tracts of land. He proposed to put up these interests as collateral for a larger note, from which he would receive additional funds to get the oil wells into operation. The idea was that

the entire note would then be satisfied from the proceeds of the sale of oil.

Vines, Wilson and Marsh met in January, 1988. The upshot was a new note to the bank for $245,000.00. The makers were Wilson and his wife and Ralph "Jay" Vines and his wife, Jo. Ralph Vines, Gurvis Vines' son, is a sports memorabilia dealer in El Dorado. The note was guaranteed by Gurvis Vines and Robert Marsh and secured by a mortgage on the forty-one acres originally bought by Jerry Wilson, together with assignments of oil revenues on Vines' oil properties and chattel mortgages on related equipment. The proceeds of the note were used to satisfy in full Wilson's $120,000.00 note and to reimburse Marsh for the $13,000.00 in interest he had previously paid. The remaining note proceeds, some $100,000.00, were deposited to the account of Jay Mike Oil Company.

Gurvis Vines' oil wells proved to be a disappointment and on March 8, 1989, Wilson, Marsh and Ralph Vines signed a note for $17,600.00 to pay the interest on the $245,000.00 note. By May of 1990 both notes were in default and the bank filed suit.

At trial both James Cook, the bank's president, and Marsh testified that they had enjoyed an excellent business relationship with each other. Cook testified that the bank had loaned Marsh some $250,000.00 to build a home in Little Rock. Marsh testified that he had borrowed $170,000.00 from the bank in 1987 to pay his income tax and had a $750,000.00 certificate of deposit there.

Cook, who had worked for the bank since 1954, had known Gurvis Vines since the 1970's. He and Vines were partners in an oil investment business from the late 1970's until 1982. Cook testified that Vines still owed him, or some other partner, money as a result of that operation.

Robert Marsh is currently in the cattle business and is apprenticing as an economist. He holds a BS in mathematics, a BS in electrical engineering, a masters in business administration from the University of Pennsylvania, and a law degree from the University of Arkansas. In Arkansas he has been employed by Arkansas Power and Light as the director of treasury and accounting, by Stephens, Inc., and by Ensco, Inc., first as treasurer and secretary and then as president.

In arguing that the bank is barred from obtaining judgment against him, Marsh relies mainly on a $420,000.00 note made by Gurvis Vines and his wife to the bank on January 16, 1986. The note was payable in monthly installments of $12,000.00, including both principal and interest. The note had a balance of $395,161.00 on January 29, 1988, the date Robert Marsh and Gurvis Vines guaranteed the $245,000.00 note sued upon here. James Cook testified that he believed the interest payments were current on the Gurvis Vines note, but only $25,000.00 had been paid on the principal.

Marsh testified that he would not have guaranteed the $245,000.00 had he known of Gurvis Vines' payment history; that he was relying on Gurvis Vines to pay the $245,000.00 note; that after the January meeting between him, Jerry Wilson, and Gurvis Vines, Vines told Marsh that he had never been this much in debt in his life; that he had no idea about the financial status of Ralph Vines; and that he felt that Cook "had gotten him into this mess." Cook testified that, although he did not divulge to Marsh the status of Gurvis Vines' note, he did tell Marsh that "Gurvis Vines could not borrow money on his own" and that Vines "had problems of his own."

In *Camp* v. *First Fin. Fed. Sav. and Loan Ass'n*, 299 Ark. 455, 772 S.W.2d 602 (1989), the supreme court adopted section 124(1) of the Restatement of Security:

> (1)   Where before the surety has undertaken his obligation the creditor knows facts unknown to the surety that materially increase the risk beyond that which the creditor has reason to believe the surety intends to assume, and the creditor also has reason to believe that these facts are unknown to the surety and has reasonable opportunity to communicate them to the surety, failure of the creditor to notify the surety of such facts is a defense to the surety.

Although appellant characterizes the defense as one of estoppel, it is clear that the restatement section is merely an application of the rule of contract law that fraud creates a defense. Restatement of Security § 124 cmt. a (1941). Comment b to § 124 states:

> b.   Although in applying the rule stated in this

Section to particular situations there is often considerable difficulty in ascertaining the precise degree of knowledge of surety and creditor and even in determining the materiality of the facts alleged to be concealed, the rule itself is simple. It does not place any burden on the creditor to investigate for the surety's benefit. It does not require the creditor to take any unusual steps to assure himself that the surety is acquainted with facts which he may assume are known to both of them. Among facts that are material are the financial condition of the principal, secret agreements between the parties, or the relations of third parties to the principal. If the surety requests information, the creditor must disclose it. Where he realizes that the surety is acting or is about to act in reliance upon a mistaken belief about the principal in respect of a matter material to the surety's risk, he should afford the surety the benefit of his information if he has an opportunity to do so.

Every surety by the nature of his obligation undertakes risks which are the inevitable concomitants of the transactions involved. Circumstances of the transactions vary the risks which will be regarded as normal and contemplated by the surety. While no surety takes the risk of material concealment, what will be deemed material concealment in respect of one surety may not be regarded so in respect of another. A creditor may have a lesser burden of bringing facts to the notice of a compensated surety who is known to make careful investigations before taking any obligation than to a casual surety who relies more completely upon the appearances of a transaction. The rule stated in this Section applies an objective test of the materiality of the facts not disclosed rather than the intent of the creditor in failing to make the disclosure.

In the case at bar the testimony was in conflict as to whether Cook told Marsh anything about Gurvis Vines' financial condition. Furthermore, the materiality of facts not disclosed is ordinarily itself a question of fact. *First Nat'l Bank and Trust Co. of Racine* v. *Notte*, 97 Wis. 2d 207, 293 N.W.2d 530 (1980). *See also Southern Equip. & Tractor Co.* v. *K&K Mines, Inc.*, 272 Ark. 278, 613 S.W.2d 596 (1981). It is also a prerequisite for the application of the section 124 defense that the creditor "has

reason to believe that [the] facts are unknown to the surety. . . ." Restatement of Security § 124(1) (1941).

The chancellor stated that Marsh's "contention that he would not have signed the guarantee had he known of a 1986 Gurvis Vines note to NBC is contrary to the evidence and is also refuted by the fact that he made no request for Gurvis Vines to guarantee the note for $17,595.00 In March of 1989." The latter is a legitimate inference the chancellor was entitled to draw. It was also proper for the chancellor to give consideration to Marsh's education and background in financial matters. Restatement of Security § 124 cmt. b. There are other distinctions between *Camp* and the case at bar. In *Camp*, the trial court was unaware of the rule and "applied the wrong standard of duty." *Camp*, 299 Ark. at 457. Here, the chancellor knew the applicable law. *Camp* involved the issuance of secret side loans to the maker after the original note was guaranteed; the allegation here is one of non-disclosure of a pre-existing liability of a co-guarantor. Our conclusion is that the question in the case at bar was one of fact and we cannot say that the chancellor's determination that Robert Marsh had not established the defense of fraud is clearly against a preponderance of the evidence. Ark. R. Civ. P. 52(a).

Appellant next contends that the chancellor erred in not finding a fiduciary relationship between him and the bank. The general rule is that the relationship between a bank and its customer is merely that of debtor and creditor. *See Lasley* v. *Bank of Northeast Ark.*, 4 Ark. App. 42, 627 S.W.2d 261 (1982). "There is no set formula by which the existence of a confidential relationship may be determined, for each case is factually different and involves different individuals." *Donaldson* v. *Johnson*, 235 Ark. 348, 359 S.W.2d 810 (1962). The question is one of fact and the party claiming the existence of the confidential relationship has the burden of proving it. *See Donaldson*, 235 Ark. at 351. These last two general rules have been applied in the context of the bank-customer relationship. *See, e.g., Dennison State Bank* v. *Madeira*, 230 Kan. 684, 640 P.2d 1235 (1982). In the case at bar, Mr. Marsh testified that he guaranteed Wilson's original note "as a favor to the bank." It was for the trial court to determine the weight to be accorded this testimony. In viewing the record as a whole, we cannot say that the chancellor's failure to find the existence of a fiduciary relationship between the bank

and Marsh was clearly against a preponderance of the evidence.

The cases appellant relies on to support this argument are not persuasive. *Walters* v. *First Nat'l Bank of Newark*, 69 Ohio St. 2d 677, 433 N.E.2d 608 (1982), stands merely for the proposition that a bank has a duty to counsel a loan applicant as to how to secure mortgage insurance. In *Richfield Bank & Trust Co.* v. *Sjogren*, 309 Minn. 362, 244 N.W.2d 648 (1976), there was apparently no contention that a fiduciary relationship existed.

■ Appellant also argues that the notes are unenforceable against him due to a "failure of consideration." It is true, as appellant contends, that a contract of guaranty, like any other contract, must be based upon consideration. *First Nat'l Bank* v. *Nakdimen*, 111 Ark. 223, 163 S.W. 785 (1914). It is not true, however, that any benefit must have passed to him personally. *See Rockafellow* v. *Peay*, 40 Ark. 69 (1882); *see also* Restatement (Second) of Contracts § 88 (1979). A contract of guaranty may be supported by sufficient consideration so long as there is a benefit to a principal debtor or guarantor, or a detriment to the guarantee. *Shamburger* v. *Union Bank of Benton*, 8 Ark. App. 259, 650 S.W.2d 596 (1983). A promise to forebear bringing suit or an agreement to extend the time for payment of a debt is sufficient consideration. *Wilson Bros. Lumber Co.* v. *Furqueron*, 204 Ark. 1064, 166 S.W.2d 1026 (1942). Here both notes were clearly supported by consideration.

Although Marsh's name appears as a maker on the March 8, 1988, note for $17,600.00, he contends that the trial court erred in finding him to be a maker of the note because the bank admitted he was a guarantor in response to requests for admission. The short answer to this contention is that the bank's admission is not binding upon the other parties to the note, who have the only real interest in the distinction.

■ Finally, appellant argues that the chancellor erred in refusing to marshal assets. The marshaling of assets is an equitable principle through which the assets and securities of a debtor are resorted to or apportioned in such a manner as to secure protection to the rights of each of two or more creditors, or of a creditor and some person other than a creditor having an interest in such assets and securities. *Bank of Bentonville* v. *Swift*

*& Co.*, 233 Ark. 808, 348 S.W.2d 881 (1961). Appellant cites no authority that would require the application of the doctrine at the instance of a co-debtor in circumstances similar to those presented here. While we agree generally with appellant's contention that the doctrine, like other equitable doctrines, should be applied in a flexible manner, we cannot say the court erred in refusing to apply it under the facts of this case.

We affirm the judgment of the trial court in its entirety.

MAYFIELD, J., not participating.

ROGERS, J., dissents.

JUDITH ROGERS, Judge, dissenting. I believe the chancellor's decision should be reversed because of NBC's non-disclosure of Gurvis Vines' financial condition to appellant. Although appellant was clearly obligated on the 1986 note for $120,000.00, I believe that NBC's actions with regard to appellant's guaranty of the 1988 note provides a defense to appellant.

In affirming the chancellor's decision, the majority refuses to apply the protection of § 124(1) of the Restatement of *Security* (1941), adopted by the Arkansas Supreme Court in *Camp* v. *First Financial Federal Savings and Loan Association*, 299 Ark. 455, 772 S.W.2d 602 (1989), to appellant. Section 124(1) provides a defense to the surety if the creditor knows facts, unknown to the surety, that materially increase the risk beyond that which the creditor has reason to believe the surety intends to assume and does not communicate these facts to the surety. Although I agree with the majority that whether this non-disclosure is material is a question of fact, I strongly believe that the chancellor's finding that NBC did not conceal material facts about Mr. Vines from appellant is clearly erroneous.

The majority opinion states § 124 is merely an application of the rule of contract law that fraud creates a defense. I strongly disagree with the majority's implication that one seeking to use this section as a defense must establish fraud. In *Camp* v. *First Fin. Fed. Sav. and Loan Ass'n*, 299 Ark. at 457, 772 S.W.2d at 604, the Arkansas Supreme Court held that it is not necessary for the surety to prove bad faith or fraudulent misrepresentation; only the elements set forth in § 124 need be proved. I am convinced that appellant proved these elements.

When appellant signed the guaranty of the 1988 note, he was ignorant of Gurvis Vines' poor financial situation and of Mr. Vines' lengthy, close relationship with NBC and its president, Mr. Cook. Although Mr. Cook testified that he informed appellant that Mr. Vines was a "problem borrower" and could not borrow this amount of money on his own, this information did not adequately inform appellant of the pertinent facts affecting the risk he was undertaking. The majority opinion does not attach enough significance to Mr. Cook's long relationship with Mr. Vines and his extensive personal knowledge of Mr. Vines' poor financial situation. He knew that Mr. Vines was not able to pay off his $420,000 note to NBC. Indeed, Mr. Cook had intimate knowledge of Mr. Vines' prior history of being unable to pay off his debts. He knew that, when Mr. Vines signed the $420,000 note, his older notes to NBC were not performing as planned. Mr. Cook also had information about Mr. Vines' bad financial situation that he had obtained during their partnership in an oil investment; in fact, he knew that Mr. Vines still owed money on that venture. Mr. Cook had reason to believe that appellant was ignorant of these facts, yet he withheld this information from appellant. It is clear that the information withheld from appellant materially increased appellant's risk far beyond that which Mr. Cook had reason to believe he intended to assume.

Additionally, the majority's description of the oil wells' performance as a "disappointment" is not completely appropriate. When the 1988 note was signed, the oil wells were not producing at all, and the evidence reveals little justification for Mr. Vines' optimism that he could make them produce adequate income to retire the debt.

Appellant's argument that, had he known these facts, he would not have signed the 1988 guaranty, is thoroughly believable and persuasive. I also cannot agree with this court's approval of the chancellor's refusal to extend the protection of § 124 of the Restatement of *Security* to appellant because he is a well-educated, sophisticated businessman. That section makes no such distinction among sureties. Although appellant clearly understood the liability of a guarantor, he did not know the full extent of the risk he was undertaking. In sum, Mr. Cook knew facts about Mr. Vines, which he had reason to believe appellant did not know, that materially increased appellant's risk beyond that which

appellant intended to assume in executing the guaranty. Because I believe appellant established his defense under § 124, I would reverse.