(167 P.3d 374)
No. 97,252

LINDEN PLACE, LLC, *Appellant,* v. STANLEY BANK, *Appellee.*

Opinion filed September 21, 2007.

*John E. Waldeck, Susan C. Hascall,* and *Michael E. Waldeck,* of Waldeck, Matteuzzi & Sloan, P.C., of Leawood, for appellant.

*R. Scott Beeler* and *Jennifer M. Hannah,* of Lathrop & Gage L.C., of Overland Park, for appellee.

Before MARQUARDT, P.J., MCANANY, J., and BRAZIL, S.J.

MCANANY, J.: This appeal arises from the district court's grant of summary judgment in favor of Stanley Bank (or Bank), the lender of funds for a residential construction project, and against Linden Place, L.L.C., the owner of the property upon which the residences were constructed. In the motion the Bank challenged the existence of any fiduciary duty owed to Linden Place under facts it claimed to be uncontroverted. It did not challenge the issue of causation. However, it did challenge Linden Place's tortious interference claim.

The peculiar facts of this case present the possibility of a fiduciary relationship during only the briefest of times. Since no issue of causation is raised, we do not address whether there is any evidence of Linden Place sustaining damages during that brief time. Nevertheless, we conclude that because there remains a genuine issue of the material fact out of which Linden Place predicates the existence of a fiduciary relationship, the issue was not appropriate for summary judgment.

With respect to Linden Place's claim of tortious interference, we conclude that the district court did not err in granting summary judgment in favor of Stanley Bank.

*Facts*

In our de novo consideration of Stanley Bank's summary judgment motion, we consider the facts and the reasonable inferences that can be drawn from those facts in the light most favoring Linden Place, the party against whom summary judgment was sought. *White v. J.D. Reece Co.*, 29 Kan. App. 2d 226, 26 P.3d 701 (2001). Accordingly, we will recount the facts in that light.

Linden Place, L.L.C., is the owner and developer of the Linden Place subdivision, a residential subdivision in southern Overland Park. Scott Harder and Michael Healey are principals in Linden Place. M&I Bank apparently provided financing to Linden Place for development of the subdivision. Steve Morris is the senior vice president of M&I Bank.

Linden Place entered into negotiations with Williams Building & Development Corporation for the purchase of lots in the subdivision. In July 2004, Williams was replaced by Linden Place Villa Homes, L.L.C., through an assignment. Nevertheless, to avoid confusion, we will refer to these entities as Williams.

Williams was a customer of Stanley Bank. Prior to Williams' purchase of the lots in question, Morris, on behalf of Linden Place, called Walt Dotson, executive vice president of Stanley Bank, to determine the reliability and economic viability of Williams. Dotson assured Morris that Williams had the capability and funding to complete construction of houses on the lots. Further, Williams advised Dotson at the outset that the owner of the subdivision had agreed to subordinate its interest in the lots. Thus, the Stanley Bank was aware of Linden Place's subordinated interest in the lots Williams was negotiating to purchase.

On March 29, 2004, Williams agreed to purchase from Linden Place 28 undeveloped lots in the subdivision at prices which ranged from $79,900 to $133,900 per lot. Williams agreed to build model homes on lots 2, 3, and 20. Lot 2 cost $79,900, lot 3 cost $94,900, and lot 20 cost $102,900. The model homes were not to be sold immediately to recoup the cost of their construction and the cost of the land, but rather were to be held for inspection by prospective purchasers of other lots in the subdivision. Williams was required

to close on the purchase of these three lots within 1 year. Linden Place agreed to subordinate its fee interest in these lots to mortgages to be held by Williams' construction lender in order to permit Williams to finance construction. The subordination agreement was intended to give Williams' lender priority over the fee interest of Linden Place in the lots when houses built on the lots were sold or in the event Williams defaulted and foreclosure was necessary. It was anticipated that when the model homes were sold, the sale proceeds would be used first to satisfy the loan from the construction lender and then to pay Linden Place for the cost of the lots before disbursement of the net profits to Williams.

On April 2, 2004, a few days after the sales agreement between Linden Place and Williams, Stanley Bank made three construction loans to Williams for construction of the model homes. Each loan was evidenced by a separate promissory note and secured by a security agreement and a mortgage from Williams on the particular lot. The loan for construction of the model home on lot 2 was in the sum of $377,000. Through a later second note this loan was increased by $65,000. The note indicated that the purpose of the loan was for construction of a spec home, and the note was to be repaid with the proceeds from the sale of the home. The loans for construction of the model homes on lots 3 and 20 contained similar provisions and were in the sum of $366,000 each. There is no indication that Williams provided any security for the loans other than the mortgage on each property. Timothy C. Williams and Scott Walker were personally obligated on the notes, but there is nothing in the record to indicate they provided any additional collateral to secure their obligations.

Harder learned from an associate of Williams that Williams was not using all of Stanley Bank's construction loan proceeds for construction on the three Linden Place lots, but was using the funds to pay other obligations. He was concerned that the Bank's loan advances would subsume the entire value of the properties, leaving nothing for Linden Place for the purchase of its lots. In the second week of October 2004, Harder met with Dotson at the Stanley Bank and expressed these concerns. Dotson told Harder he would investigate the matter and report back shortly. Dotson acknowl-

edged in a later affidavit that at this meeting he had refused to disclose any information to Harder regarding the disbursement of loan proceeds without Williams' consent.

Two days later Harder contacted Dotson again, and Dotson assured Harder that he had looked into the matter and was handling it. He told Harder not to be alarmed about the situation and that expenditures would be monitored carefully in the future.

Shortly thereafter Harder learned of additional improper expenditures by Williams. He contacted Dotson to alert him to the ongoing misuse of loan proceeds. Harder also contacted Joe Jackson, the president of Stanley Bank, during the first week of November 2004. He reiterated his concerns to Jackson, who thanked Harder for bringing the matter to his attention and assured Harder that he would look into the matter and report back shortly. When Harder called Jackson again the next day, Jackson advised that he had no further comment on the matter and was now represented by counsel.

Linden Place initiated this action on May 16, 2005, against Stanley Bank for breach of fiduciary duty and tortious interference with existing contractual relations. On May 26, 2005, lot 2 was sold. Linden Place did not receive any of the proceeds to apply to the purchase price of the lot.

Stanley Bank moved for summary judgment. At the hearing on the motion, the court was informed that a contract for the sale of lot 20 was pending; lot 3 remained unsold; and Stanley Bank had recently initiated foreclosure proceedings, apparently on lot 3. Following the hearing the district court sustained the motion, finding no fiduciary relationship between Linden Place and Stanley Bank but making no findings with respect to the tortious interference claim. Nevertheless, the court's journal entry indicates that summary judgment was granted on all of the claims asserted by Linden Place.

Linden Place appeals.

*Breach of Fiduciary Duty*

The parties are well acquainted with the fact that summary judgment is appropriate only when there is no genuine issue of material

fact and the movant is entitled to judgment as a matter of law. K.S.A. 60-256(c). In considering this appeal, we stand in the shoes of the district court and consider the motion de novo. *Associated Wholesale Grocers, Inc. v. Americold Corp.*, 261 Kan. 806, 820, 934 P.2d 65 (1997). As noted earlier, our review of the evidence is in the light most favoring Linden Place, the party against whom summary judgment was sought. Further, in determining whether there exists a genuine issue of material fact we consider not only the evidence but the reasonable inference that may be drawn from the evidence.

Stanley Bank relies upon the clear and convincing evidence standard as the controlling standard for our review. While this standard ultimately may apply at trial, it does not apply at the summary judgment stage. To overcome summary judgment the existence of a genuine issue of material fact need not be established by clear and convincing evidence. See *Rebarchek v. Farmers Co-op Elevator & Mercantile Ass'n*, 272 Kan. 546, 551-52, 35 P.3d 892 (2001).

Linden Place claims the district court erred in failing to recognize the existence of a fiduciary relationship between Linden Place and Stanley Bank. As stated in *Reebles, Inc. v. Bank of America, N.A.*, 29 Kan. App. 2d 205, 208-09, 25 P.3d 871 (2001):

"A fiduciary relationship exists where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence. *Ford v. Guarantee Abstract & Title Co.*, 220 Kan. 244, 553 P.2d 254 (1976). Whether a fiduciary relationship exists depends on the facts and circumstances of each individual case. The Kansas Supreme Court has refused for that reason to give an exact definition to fiduciary relationships. See *Denison State Bank v. Madeira*, 230 Kan. 684, Syl. ¶ 2, 640 P.2d 1235, *modified on reh.* 230 Kan. 815, 640 P.2d 1235 (1982).

"Generally, there are two types of fiduciary relationships: (1) those specifically created by contract or by formal legal proceedings and (2) those implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions. The determination of the existence of a fiduciary relationship in the second category is more difficult to determine. *Denison State Bank*, 230 Kan. at 691."

There is no contract or formal proceedings creating any fiduciary relationship between Linden Place and Stanley Bank. Accordingly,

we must consider whether there are facts out of which a fiduciary duty may arise if those facts are established later at trial. That consideration discloses an extraordinarily close question. We are aware of the cautionary language of *Denison* regarding the reasonable diligence one must exercise for one's own protection, and the danger of turning ordinary business transactions into fiduciary relationships. As the *Denison* court points out, "one may not abandon all caution and responsibility for his own protection and unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held liable as a fiduciary." *Denison State Bank v. Madeira*, 230 Kan. 684, 696, 640 P.2d 1235 (1982). Nevertheless, there are features of *Denison* that distinguish it from the facts now before us and which render those cautions inapplicable.

First among those distinctions is the fact that *Denison* was reviewed after a jury trial, not the entry of summary judgment. In *Denison* the defendant, the prospective buyer of an auto dealership, claimed the seller's bank failed to disclose the fact that the bank was a major creditor of the dealership. The court found that the bank did not misrepresent any facts regarding its relationship with the auto dealership, but simply failed to disclose information about which the defendant failed to ask. Further, the information defendant claimed was withheld was found in financial records of the auto dealership to which the buyer had access.

In the case before us, Linden Place did not have access to information regarding Williams' use of the construction loan proceeds. It only knew that construction was not progressing on the lots as promised. Information regarding use of the loan proceeds was within the knowledge of Stanley Bank, and the Bank refused to disclose that information to Linden Place when asked. Rather, Dotson, on behalf of the Bank, told Harder that he would investigate the matter and report back shortly. Two days later Dotson assured Harder that he had looked into the matter and was handling it. He told Harder not to be alarmed about the situation and that expenditures would be monitored carefully in the future. During the first week of November 2004, Bank President Jackson also assured Harder that the Bank was looking into the matter. It was

the following day that Jackson advised that he had no further comment on the matter. Under the version of the facts we use for purposes of summary judgment, rather than abandoning all caution and responsibility for its own protection, Linden Place sought out the Bank, the only entity in a position to verify malfeasance by Williams and to do something about it. Stanley Bank was aware of Linden Place's perilous position, having subordinated its fee title to the Bank's construction loans. The clear purpose of Dotson's statement to Harder, if true, was to instill in Linden Place the belief that any malfeasance by Williams was being looked into and steps were being taken to prevent any further actions by Williams which would undermine Linden Place's subordinated position. Rather than placing Linden Place at arm's length, as Jackson ultimately did in November, Dotson voluntarily undertook to protect Linden Place's subordinated position.

In *Dugan v. First Nat'l. Bank in Wichita*, 227 Kan. 201, 606 P.2d 1009 (1980), Dugan owned a tract of ground which was subject to an 87-year lease. Dugan agreed to subordinate her fee interest to enable her tenant to obtain a construction loan for improvements on the property, with the understanding that the cost of the improvements would exceed $275,000. She banked with First National Bank, the lender for the construction project. Dugan later learned that part of the construction loan proceeds was used to pay unrelated debts of the tenant, not the cost of improvements on the leasehold. Dugan sued the bank on various theories, including breach of fiduciary duty. In finding no fiduciary relationship, the court noted that Dugan had had no discussion with any bank officer regarding the construction project. Further, the general rule is that the relationship between a bank and its depositor is a debtor-creditor relationship, not a fiduciary relationship. A fiduciary relationship may arise, however, in situations in which "the bank had dealt directly with the customer regarding the matters involved in the litigation, and the bank had knowledge of the reliance and confidence of the customer; in some instances the bank stood to profit from non-disclosure to the customer." 227 Kan. at 208.

There was no evidence that Dugan relied upon any statements by the bank regarding disbursements of loan proceeds. However,

in the case now before us, there is evidence, which we must accept for purposes of Stanley Bank's summary judgment motion, that Linden Place, though not a customer of the Bank, was told by its executive vice president that Linden Place should not be alarmed about the situation and that expenditures would be monitored carefully in the future.

There is conflicting evidence regarding the communications between Linden Place and Stanley Bank which bear upon the relationship between these parties. Clearly Stanley Bank had no fiduciary duty to Linden Place at the outset of the loan. The Bank had no obligation to monitor for Linden Place's benefit its periodic disbursement of loan proceeds at the outset of the transaction. There was no contact between Linden Place and Stanley Bank regarding the disbursement of loan proceeds until the second week of October 2004. Dotson's statements at that time, that the Bank was looking into the issue of loan disbursements, did not impose upon the Bank a duty to Linden Place. A reasonable person could not conclude, from those remarks, that the Bank was undertaking to look out for Linden Place's interests. But there remains a fact issue as to whether 2 days after Harder's initial discussion with Dotson, Harder received assurances from Dotson that Linden Place should not to be alarmed by the situation and that expenditures would be monitored carefully in the future. It is certainly possible that out of such discussions a fiduciary relationship could arise, albeit for a short period of time, since during the first week in November 2004, Jackson disavowed any ongoing efforts on Linden Place's behalf. And as noted earlier, we are not asked to resolve whether there was any evidence of improper action or inaction by the Bank during this brief period that caused damages to Linden Place.

Because the material facts giving rise to the alleged fiduciary relationship are controverted, the issue of whether Stanley Bank breached a fiduciary duty owed to Linden Place was not appropriate for summary judgment. See *Reebles*, 29 Kan. App. 2d at 210. Based upon the evidence before it and the manner in which that evidence must be viewed, the district court erred in granting summary judgment on this claim.

*Tortious Interference*

In order to withstand summary judgment on its claim of tortious interference, Linden Place must point to evidence in the record to support (1) the existence of a contract between it and Williams, (2) Stanley Bank's knowledge of it, (3) the Bank's intentional procurement of its breach, (4) the absence of justification, and (5) resulting damages. See *Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106 (1986).

Linden Place contends Stanley Bank induced Williams to breach its contract with Linden Place by failing to monitor Williams' use of the loan proceeds when it knew that they were not being used in the manner required by the contract between Linden Place and Williams. First, Linden Place fails to identify, and we fail to find, any provision in the contract which dealt with Williams' use of construction loan proceeds. The contract required Williams to build model homes on the lots and pay for the lots within 1 year following the effective date of the contract. Failure to build the model homes or failure to close on the lots within 1 year constitutes a breach of the contract, not the failure to use borrowed funds to build the model homes.

But if we ignore this problem, we are still confronted with Linden Place's burden of showing some evidence of an intentional inducement to breach. Further, there must be evidence that the Bank's conduct was malicious in order to withstand summary judgment, *i.e.*, a showing that the Bank acted in a state of mind characterized by an intent to do a harmful act without reasonable justification or excuse. *Turner* dealt with the claimed tortious interference with a prospective business advantage by Halliburton informing Turner's prospective new employer that Turner had been discharged for stealing company property. Our review of the cases involving claims of tortious interference with an existing contract discloses a common theme of interference with the performance of a contract to further the tortfeasor's own interests, or diversion of some benefit under the contract to the tortfeasor's own use and benefit. We find no evidence in the record of any such conduct here. Stanley Bank did not intentionally and maliciously

urge or induce Williams to breach his contract with Linden Place. The Bank did not divert to its own benefit funds which should rightfully have gone to Linden Place.

Linden Place's reliance on *Reebles* to support this claim is misplaced. In *Reebles* the bank took affirmative steps to divert funds from their intended use to satisfy the bank's own interests. The bank affirmatively represented that the back rent for the gymnasium would be paid out of the proceeds deposited by the buyer for the purchase of Nautilus exercise equipment at the gym. Contrary to this representation, at the closing of the transaction the bank used the sales proceeds to satisfy Brown's debt to the bank which was secured by the Nautilus equipment. We find no comparable conduct here. If Williams improperly diverted construction loan proceeds from their intended purpose, both Linden Place and Stanley Bank were at risk. Such conduct by Williams would cause Stanley Bank's loan advances to grow while the equity in its collateral would not. Linden Place, however, would be at a greater risk because of its subordinated position.

We fail to find any evidence from which a jury could conclude that Stanley Bank intentionally and maliciously procured a breach by Williams of his contract with Linden Place. The district court did not err in granting summary judgment on this claim.

Affirmed in part and reversed in part.

MARQUARDT, J., concurring in part and dissenting in part: I respectfully concur in part and dissent in part.

I concur with the majority's opinion affirming the trial court's dismissal of the tortious interference with contract claim.

I dissent from the majority's reversal of summary judgment on the breach of fiduciary claim. The majority claim that a fiduciary relationship existed between Stanley Bank (Bank) and Linden Place because "Linden Place, though not a customer of the bank, was told by its executive vice president that Linden Place should not be alarmed about the situation and that expenditures would be monitored carefully in the future."

The majority rely on *Dugan v. First Nat'l Bank in Wichita*, 227 Kan. 201, 208, 606 P.2d 1009 (1980), claiming that a fiduciary

relationship may arise "in situations in which 'the bank had dealt directly with the customer regarding the matters involved in the litigation, and the bank had knowledge of the reliance and confidence of the customer; in some instances the bank stood to profit from non-disclosure to the customer.' " Here we are not dealing with a bank and its own customer. We are dealing with a bank and a third party that had no relationship with the Bank. There is no fact or legal basis for the conclusion that a fiduciary relationship existed between Linden Place and the Bank.

Linden Place argues that the Bank promised to monitor Williams' loan proceeds for Linden Place. However, the Bank never said that; it said it would investigate the matter and report back to Linden Place. Linden Place contends a fiduciary relationship was created between it and the Bank when the Bank said it would monitor Williams' loan proceeds. They further contend that a breach of that relationship occurred when the Bank failed to stop Williams from spending the loan proceeds on projects other than Linden Place's model homes.

Before a determination can be made on whether the Bank breached a fiduciary duty to Linden Place, we must establish whether there was a fiduciary relationship between the Bank and Linden Place. A fiduciary relationship exists where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence. *Reebles, Inc. v. Bank of America, N.A.*, 29 Kan. App. 2d 205, 208, 25 P.3d 871, *rev. denied* 272 Kan. 1419 (2001).

Some indicia of a fiduciary relationship include the acting of one party for another, the exercising of influence by one party over another, the reposing of confidence by one party in another, the inequity of the parties, and the dependence of one party on another. *Morrison v. Watkins*, 20 Kan. App. 2d 411, 422, 889 P.2d 140, *rev. denied* 257 Kan. 1092 (1995).

The existence or nonexistence of a fiduciary relationship is an evidentiary question or finding of fact which must be determined from the facts in each case; therefore, the scope of appellate review is to ascertain only whether there is substantial competent evidence

to support the finding of the trial court. *In re Estate of Bennett*, 19 Kan. App. 2d 154, 166-67, 865 P.2d 1062 (1993), *rev. denied* 254 Kan. 1007 (1994).

First of all, Linden Place never reposed confidence in the Bank. All the contacts and contracts the Bank had were with Williams. The real estate contract between Linden Place and Williams never mentions the Bank. None of the mortgages obtained by Williams from the Bank ever mention Linden Place.

The only evidence in the record on appeal even tangentially related to an agreement between Linden Place and the Bank is Harder's affidavit. Even if we take every statement in Harder's affidavit as true, as we are required to do, there is nothing in the affidavit to indicate that Linden Place had any agreement with the Bank. Instead, the evidence is that Harder phoned the Bank and was told that the Bank would investigate. Nothing about that assurance from the Bank implies that the Bank agreed to protect Linden Place's interest in the properties.

There is no evidence in the record on appeal which would lead any reasonable observer to determine that the Bank had any fiduciary duty to Linden Place. Linden Place was not a party to any of the dealings between the Bank and Williams. Accordingly, it is difficult to imagine how the Bank could owe Linden Place any duty. For that reason, the trial court did not err by granting the Bank's motion for summary judgment on the issue of breach of a fiduciary relationship, and I would affirm the trial court on this issue.