**TERRA VENTURE, INC., et al., Plaintiffs,**

v.

**JDN REAL ESTATE—OVERLAND PARK, L.P., et al., Defendants.**

**No. CIV.A. 02–2593–GTV.**

United States District Court, D. Kansas.

Oct. 14, 2004.

Michael Lerner, Law Office of Mick Lerner, P.A., Overland Park, KS, for Plaintiffs.

Leland H. Corley, Robert W. Tormohlen, Lewis, Rice & Fingersh, L.C., Kansas City, Mo, for Defendants.

### MEMORANDUM AND ORDER

VanBEBBER, Senior District Judge.

This breach of contract action is before the court on the motion for summary judgment (Doc. 195) filed by Defendants JDN Real Estate—Overland Park ("JDN Over-land Park"), JDN Realty Corporation ("JDN Realty"), JDN Development Company ("JDN Development"), Belle Meade Acquisition Corporation ("Belle Meade"), and Developers Diversity Realty Corporation ("DDR"). Plaintiff Terra Venture, Inc. ("Terra Venture") and Terra Venture Realty Inc. ("TV Realty") seek over five million dollars in lost commissions, fees, and profits, alleging that Defendants breached two written agreements, one of which obligated Defendants to develop a real estate project in a timely manner. Plaintiffs allege that Defendants delayed development of the property such that Plaintiffs were unable to earn commissions and fees as contemplated by the agreement. Defendants respond that nothing in the agreement obligated them to develop the property at all, let alone in a timely manner. For the following reasons, the court grants Defendants' motion for summary judgment.

## I. FACTUAL BACKGROUND

The following facts are taken from the summary judgment record and are either uncontroverted or viewed in the light most favorable to the non-moving parties' case. Immaterial facts and facts not properly supported by the record are omitted. References to testimony are from depositions, unless otherwise noted.

### A. The Parties

Terra Venture is a Kansas corporation that is engaged in the business of developing and marketing commercial real estate. TV Realty, also a Kansas corporation, provides real estate brokerage services. Although TV Realty tendered a listing agreement to Defendants, they refused to accept or sign the agreement. Despite the lack of a written agreement, TV Realty provided real estate brokerage services to Defen-

dants, and Defendants paid TV Realty over $250,000 in commissions.

During the time relevant to this lawsuit, Defendants have been related entities. JDN Overland Park is a Georgia limited partnership, and is a party to both written agreements with Terra Venture. JDN Overland Park is a subsidiary of JDN Realty and JDN Development. JDN Development is a Delaware corporation whose sole purpose is to supply "product" in the form of developed projects to JDN Realty, and is a wholly-owned subsidiary of JDN Realty. JDN Realty is a Georgia corporation that did not sign either agreement with Terra Venture. It became a wholly-owned subsidiary of DDR, a real estate investment trust, when it merged with a wholly-owned subsidiary of DDR on March 13, 2003. Belle Meade was a Georgia corporation related to the JDN family that is now dissolved, and signed an agreement under which it agreed to assume all of the obligations in the agreements between Terra Venture and JDN Overland Park.

JDN Realty funded all JDN operations, but JDN Overland Park was designated to own the tract of land at issue in this case. JDN Overland Park has no employees of its own, and a company representative did not know whether it maintained its own bank account.

The officers of the companies are not parties to this action, but they were involved in the transactions at issue. Gray Turner, John Sweeney, and Jack Isley are the shareholders of Terra Venture and the owners of TV Realty. John Sweeney has a real estate license and is the licensed broker for TV Realty. Gray Turner executed the agreements on behalf of Terra Venture. Jeb Hughes executed the agreements on behalf of JDN Overland Park, and was an officer of JDN Development. Bob Lilly was an employee of JDN Development, and was the person primarily in charge of the development project.

During the time of their relationship, it appears that Defendants had the more controlling position of the parties. In his deposition, Gray Turner described the relationship of the parties: "JDN had the complete right to approve all deals. I mean, we had no say. We'd bring them a deal ... and it was theirs to approve or not to approve." John Sweeney gave a similar description of the relationship in his deposition:

A: [W]hen we signed our agreement with JDN it was made clear to us that they were running the project and that we were to be available to assist them in whatever way they might ask us to assist the development process.

. . . . .

Q: Was it your understanding and belief that JDN had the right to approve the deals and the economics of those deals?

. . . . .

A: Once we signed our agreement with JDN, they took—basically took control of the project and they had the ability to make the decisions on what transactions we would actually conclude in the project.

Q: [W]as it your understanding that JDN would be approving the deals, the economics of the deals?

A: Yes.

## B. The Written Agreements

On March 6, 1998, Terra Venture entered into a written agreement with Ranch Mart, Inc., ("Ranch Mart"), whereby Ranch Mart agreed to sell to Terra Venture approximately 100 acres of undeveloped property on the northeast corner of 135th Street and Antioch in Overland Park, Kansas. Ranch Mart later granted Terra Venture the option of assigning the

sale agreement to JDN Realty or a related entity.

Before closing with Ranch Mart, Terra Venture entered into an agreement with JDN Overland Park on March 15, 1999 ("Assignment Agreement"), in which Terra Venture agreed to assign its rights and interests in the Ranch Mart sale agreement to JDN Overland Park. The parties also entered into a Fee Agreement. The Fee Agreement provided in part:

> [JDN Overland Park] intends to purchase certain Property (as defined below). In connection with the ownership and development of the Property, [JDN Overland Park] agrees that certain fees may be earned by [Terra Venture] upon the terms and conditions set forth below, and [Terra Venture] agrees to perform certain services in connection with the development of the property.

Before the closing date with Ranch Mart, JDN Overland Park conveyed all of its rights to the Ranch Mart sale agreement and Fee Agreement to Belle Meade. On October 1, 1999, the parties closed on the Ranch Mart sale agreement, and Belle Meade became the owner of the property. At closing, Belle Meade ratified the Fee Agreement and agreed to perform its terms and to be bound by it. Belle Meade later transferred all of the individual parcels of land within the property to third-party purchasers or to JDN Realty, JDN Development, or JDN Overland Park.

The Fee Agreement obligated JDN Overland Park to reimburse Terra Venture for its earnest money deposits and predevelopment expenses upon closing. JDN Overland Park also agreed to pay all approved development expenses, earnest money deposits, and fees to extend the Ranch Mart sale agreement until the closing date of the Ranch Mart sale agreement. Terra Venture was appointed as the exclusive selling and leasing agent for the project. JDN Overland Park agreed

to pay Terra Venture a development fee of $300,000, market commissions to be negotiated, and a conditional earnout fee. The earnout fee was defined in the Fee Agreement between the parties dated March 15, 1999, as "the fee, if any, payable to Developer [Terra Venture] on the Earnout Date [48 months after the date of the agreement] which shall equal fifty percent (50%) of the positive difference, if any, between (x) the Actual Project Value, minus (y) the Project Costs, and (z) the Breakeven Period Interest." Thus, it appears that the earnout fee was only payable if the project achieved certain profit levels. Two places in the Fee Agreement reference the earnout fee by stating, "the earnout fee, *if any*, ..." (Emphasis added.) The court construes the Fee Agreement to contemplate situations where an earnout fee might not be earned. Moreover, the opportunity to receive an earnout fee or any other compensation from the project terminated after forty-eight months.

Pursuant to the Fee Agreement, Terra Venture agreed "to devote its reasonable best efforts to assist [JDN Overland Park] as called on by [JDN Overland Park] in the development of the Project and in consideration thereof [JDN Overland Park] shall pay the Development Fee to [Terra Venture]." JDN Overland Park paid the $300,000 development fee to Terra Venture and reimbursed its predevelopment expenses and earnest money deposits. JDN Overland Park also paid Terra Venture Realty market commissions in excess of $250,000 on sales and leases of property within the project, which constituted the full amount owed on qualified leases and sales on the project during the four year term of the Fee Agreement.

The Assignment Agreement also limited transfers of interest:

> 3. JDN agrees that it will not further assign its interest in such contract with-

out first obtaining the written consent of the Seller [Ranch Mart] under the Contract.

4. JDN agrees that in the event any other entity acquired any interest in the Contract or the real estate which is the subject of the Contract (other than the sale or lease of part of such real estate to users or tenants), it will require such entity to deliver to Terra Venture an agreement whereby such entity agrees to assume and be liable for JDN's obligations under the Fee Agreement.

The Fee Agreement indicated how the parties should represent themselves to the public:

5.b. [Terra Venture] and [JDN Overland Park] agree that all signage on the Property shall indicate that the Project is being developed and marketed as a project of Terra Venture, Inc. [Terra Venture] and [JDN Overland Park] agree that [JDN Overland Park] will issue press releases in industry and financial publications indicating that the Property is a joint venture between [Terra Venture] and [JDN Overland Park].

Finally, the Fee Agreement contained several "Miscellaneous" clauses, including the following:

8.e. This Agreement contains the entire agreement of the parties hereto with respect to the subject matter hereof, and no representations, inducements, promises, or agreements, oral or otherwise, between the parties not embodied herein or incorporated herein by reference shall be of any force or effect.

8.g. No amendment to this Agreement shall be binding on any of the parties hereto unless such amendment is in writing and is executed by the party against whom enforcement of such amendment is sought.

8.h. Time is of the essence of this Agreement.

Despite the "time is of the essence" clause, neither the Fee Agreement nor the Assignment Agreement provided a date by which construction on the project was required to begin or be completed.

### C. Oral Representations

Before signing the Fee and Assignment Agreements, Jeb Hughes explained to Terra Venture that JDN would take over the project and get it built. He estimated that the construction period would last about twelve months. He and Gray Turner discussed the earnout potential, and both agreed that the project could be done in eleven or twelve months. Turner also testified in deposition as follows:

Q: Did either Jeb or Bob promise that the project would be done within a certain period of time, or was it discussed in generalities?

A: Are we talking—still talking prior to the signing of the documents?

Q: Right.

A: It was an implied promise. I mean, again, we had been in the—I've been in the development business for 30 years. And Jeb and I talked about it and Bob and I talked about it. And we both agreed, Jeb and I agreed, that, you know, this is a deal that can be done within an 11 or 12–month period.

. . . . .

A: Bob and Jeb came to me and said, This is the way we'll do it, this will take a year. Did they say, We promise this will take a year? Absolutely not. But I've been doing this for 30 years. And when they said, You know what, we'll build this thing within 12 months, I said, You know what, I believe that, because I've done it within 12 months or less and you guys have been doing this for years. So there was no promise needed, it was

just an understanding, a statement of fact, and we agreed to the facts.

. . . . .

Q: Mr. Turner, hopefully, just one more area. I was a little bit confused by your testimony after I looked at Count 4 of your First Amended Complaint. And I'm assuming—did you read your amended complaint before it was filed?

A: Yes, I have.

Q: There's a count for Promissory Estoppel that says, "In connection with the March 15, 1999 agreements, JDN Real Estate promised Plaintiff that it would develop and market the property at issue within approximately two years." Do you recall that allegation being in there?

A: Yes.

Q: Earlier today, we were talking about some of the conversations that occurred, prior to the March 15, 1999 agreement, and I thought your testimony was that everything was gonna be done in a year?

A: No. And I talk about it in this budget, for example. There's some things that happened 18 months out. I mean, the conversation we had was, here's the things that have to happen in the first year. Some of these things may last up to two years, but I think it was everyone's expectations when we started this transaction, that within two years, this would be fully developed.

Q: Okay.

A: They provided us a four-year window in case there was—or we wanted to hang around, if there was an out-lot. . . .

Q: That was your expectation that it would take two years?

A: It was kind of an outside date that we discussed, yeah. I mean, it was 12 months to do certain things, 18, ten months, 20 months.

Q: ... You've got the allegation that JDN promised Terra Venture that it would develop and market the property. Did that occur in a conversation? Did somebody say JDN promises -

A: I think the document itself promises that they'll do that. I mean, that's my -

Q: Which document? Is that the pro forma?

A: The fee agreements and the pro formas and the development—I mean, the assignment agreement, I mean, we had the belief, and they told us—I mean, you use the word "promise," and I've told you before, I don't recall Jeb Hughes saying, I promise I'm gonna do this. . . . He said, Here's what we're gonna do. Sign these agreements, we'll develop the property. You give us control of this property, we will develop it, and we will make money for you, and there will be an earn-out. Now, I think that's an implied promise, if not an actual promise. And he said, I will do this.

Q: But you don't remember Jeb Hughes ... you don't remember anybody else at JDN saying, I promise it's gonna be two years, but you've pulled that promise out of the documents; is that correct?

A: In our discussions, as I say, it's not typical in a business transaction to have somebody say, I promise I'm gonna do this. You sit down and you say, we're gonna do this, you're gonna do this, and this is what's gonna happen. That's how this transaction took place.

John Sweeney testified that both parties expected that Terra Venture would be entitled to an earnout fee. He testified in deposition that "JDN said, here is a budget, this is what we think this project can do, this is what they do as their business, and they said, this is a reasonable expectation of what can happen on this project and you should be—expect to earn dollar

amounts close to what you see in this budget."

Sweeney saw one budget, or "pro forma," prior to March 1999. He testified in deposition that "[T]he earnout fee was the inducement for us to enter into an agreement with JDN... And so when they came up with a budget to show us, you're going to make $2.6 million in earnout and $1.1 million in commissions or shares of commissions and a development fee, we felt that was the best financial transaction available to us. We had other parties who were interested in doing the development with us."

### D. The Development of the Project

The 100–acre tract involved in this lawsuit was undeveloped land at the time of purchase. Currently, several retailers and businesses are located on the property, including Sam's Club, Home Depot, Goodyear Tire, Aldi's, Wendy's, Intrust Bank, Bank of America, and Party City.

Site work on the project began in late 1999 or early 2000. Wayne Stubbs, an employee of JDN Development, was project/construction manager of the project, and was the cause of delays. He was unable to make decisions and paid no attention to the project. At times, he did not visit the project for weeks at a time. It is uncontroverted that numerous, if not all, potential tenants experienced delays in consummating deals, ranging from a few months to a year-and-a-half. Some retailers and businesses decided to open at other locations because they lacked confidence in Defendants' ability to deliver the premises in a timely manner. Terra Venture was trying to get leases negotiated with tenants, but it took Defendants six months to a year to get letters of intent and leases negotiated, when the turnaround on letters of intent should have been thirty to sixty days. Because of the delays in the project, prices escalated and interest accrued and compounded.

Internally, JDN Development was experiencing trouble. On February 14, 2000, the SEC forced Jeb Hughes to resign. When he resigned, no one was in charge at JDN Development. After his resignation, JDN Development went through four CEO's within two months.

Terra Venture began complaining about delays on the project in October 1999 and complaining that JDN was spending too much money and exceeding the budget in late 1999 or early 2000. By November 20, 2000, Terra Venture was aware that because of delays on the project, Terra Venture had no chance of receiving an earnout fee. On November 20, 2000, John Sweeny wrote a memo to Gray Turner that stated in part: "As a joint venture partner, Terra Venture would have no possibility of receiving an earnout fee from this project."

One of Jeb Hughes's replacements, Fred Williams, told Gray Turner in March or April 2000, "I don't give a damn about you. This is our money and we're gonna spend it how we want to spend it. I've got too many other problems here trying to save this company, to worry about this project.... I'll get back to you when I have time."

In October 2000, Craig McNabb, who was Fred Williams's replacement, told Gray Turner that he was right, the delays in the project were ridiculous. In November 2000, McNabb told Gray Turner and John Sweeney that JDN had "screwed this thing up, we'll make it up to you." He offered to renegotiate the deal so that Terra Venture would earn an earnout fee. Terra Venture claims that it did not realize that the deal would not be renegotiated until JDN filed a lawsuit against Terra Venture with respect to another development in 2001.

Additional facts may appear throughout this Memorandum and Order as necessary.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Lack of a genuine issue of material fact means that the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be met by showing that there is a lack of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. "[A] party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* The court must consider the record in the light most favorable to the nonmoving party. *Bee v. Greaves*, 744 F.2d 1387, 1396 (10th Cir.1984).

## III. DISCUSSION

Terra Venture claims that it is entitled to damages for several reasons: (1) Defendants breached their fiduciary duty to Terra Venture; (2) Defendants breached their contract with Terra Venture; (3) Defendants are estopped from denying their obligations to Terra Venture; and (4) Defendants accepted services without compensating TV Realty for their value (quantum meruit). Plaintiffs also seek an accounting and damages for a failed plan to develop an auto mall. The court will address each claim in turn.

### A. Breach of Fiduciary Duty

■ Terra Venture first claims that Defendants breached their fiduciary duty when they failed to develop the property in a timely manner. Under Kansas law, " '[a] fiduciary relation ... exist[s] in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence.' " *Denison State Bank v. Madeira*, 230 Kan. 684, 640 P.2d 1235, 1242 (1982) (quoting *Lindholm v. Nelson*, 125 Kan. 223, 264 P. 50, 54 (1928)). There are generally two types of fiduciary relationships:

"(1) those specifically created by contract such as principal and agent, attorney and client, and trustee cestui que trust, for example, and those created by formal legal proceedings such as guardian and/or conservator and ward, and executor or administrator of an estate, among others, and (2) those implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each

other and to the questioned transactions."

*Rajala v. Allied Corp.*, 919 F.2d 610, 613 (10th Cir.1990) (quoting *Denison*, 640 P.2d at 1241). The Kansas Supreme Court has identified several broad principles that should be considered in determining whether a fiduciary relationship exists:

A fiduciary relationship imparts a position of peculiar confidence placed by one individual in another. A fiduciary is a person with a duty to act primarily for the benefit of another. A fiduciary is in a position to have and exercise, and does have and exercise influence over another. A fiduciary relationship implies a condition of superiority of one of the parties over the other. Generally, in a fiduciary relationship, the property, interest or authority of the other is placed in the charge of the fiduciary.

*Denison*, 640 P.2d at 1241 (citation omitted). Absent clear intent by the parties, an ordinary business relationship should not be converted into a fiduciary relationship. *Gottstein v. Nat'l Ass'n for Self Employed*, 53 F.Supp.2d 1212, 1222 (D.Kan.1999) (citing *Denison*, 640 P.2d at 1243). "[C]onscious assumption of the alleged fiduciary duty is a mandatory element under Kansas law." *Rajala*, 919 F.2d at 615 (citation omitted).

■ Terra Venture claims that a fiduciary relationship existed between the parties because the parties had formed a joint venture and because the relationship was implied in law. Whether a fiduciary relationship existed is a question of law. *In re Villa W. Assocs.*, 146 F.3d 798, 806 (10th Cir.1998).

### 1. Joint Venture

The court first examines whether the parties engaged in a joint venture, and determines that they did not.

■ "Under Kansas law, in general, a 'fiduciary duty' exists among joint ventur-

ers." *In re Klippel*, 183 B.R. 252, 259 (Bankr.D.Kan.1995) (citation omitted). "A joint venture is defined in general terms to be a special combination of two or more persons devoted to a specific enterprise in which profit is jointly sought without actual partnership or corporate designation." *Opco, Inc. v. Scott*, 321 F.2d 471, 473 (10th Cir.1963) (citation omitted). "The relationship may arise from express contractual provisions or out of acts and conduct." *Id.* "'When the relationship of joint adventurers exists, the parties stand in a close relationship of trust and confidence and are bound by the same standards of good conduct and square dealing as are required of partners.'" *Amoco Prod., Co. v. Charles B. Wilson, Jr., Inc.*, 266 Kan. 1084, 976 P.2d 941, 949 (1999) (citation omitted). The factors for determining whether a joint venture exists are:

(1) the joint ownership and control of property; (2) the sharing of expenses, profits and losses, and having and exercising some voice in determining the division of the net earnings; (3) a community of control over the active participation in the management and direction of the business enterprise; (4) the intention of the parties, express or implied; and (5) the fixing of salaries by joint agreement.

*Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 226 Kan. 70, 596 P.2d 816, 823 (1979). Terra Venture argues that four of the five elements are met in this case. The court disagrees.

Terra Venture acknowledges that the first factor, joint ownership and control of the property, is not met. With respect to the second factor, Terra Venture argues that it is met because the parties agreed to share equally in the profits earned on the project through the payment of an earnout fee. Terra Venture contends that because the earnout fee was reduced by expenses

incurred, the parties shared in the expenses. But Defendants paid all expenses on the project and reimbursed Terra Venture for predevelopment expenses incurred. While Terra Venture's earnout fee may have been dependent upon the success of the project, Terra Venture received a $300,000 development fee regardless of whether the project lost money. Moreover, Terra Venture did not have a voice in determining the division of net earnings. Before the project began, the parties agreed that Terra Venture would receive the earnout fee if the project returned 11% after deducting all expenses. Once the project began, Terra Venture had no control over the project or the division of net earnings.

The third factor is a community of control. Terra Venture claims the factor was present because Terra Venture controlled the marketing and the obtaining of potential tenants, while Defendants controlled the finances, the approval of leases, and the site work. But Terra Venture also offers the following uncontroverted facts: (1) "Terra Venture had no control over approval of leases or sales"; (2) "JDN had the right to approve all transactions"; (3) "JDN directed how the site plans would look, what flavor the development would take, where the buildings would be placed, what transactions would be approved, and what changes could be made to the development plans"; (4) "JDN made the decisions on these aspects of the project and told Terra Venture that was 'the JDN way' and Terra Venture had to take it or leave it." In light of these facts, the court has difficulty seeing how the parties shared a community of control.

Terra Venture claims that the fourth factor, the intention of the parties, is met because the parties referred to their relationship as a joint venture and held themselves out to the public as a joint venture. Although the parties agreed to hold them-

selves out to the public as a joint venture, they did not specifically agree that their legal relationship was a joint venture.

Finally, Terra Venture argues that the fifth factor, the fixing of salaries, is met because the parties jointly agreed on the amounts to be paid to Terra Venture. The court disagrees. JDN Overland Park agreed to pay market rate commissions, not salaries, to Terra Venture. Terra Venture had no control over the salaries paid to JDN Overland Park. The fifth factor is not present in this case.

Based on the analysis of the above factors, the court concludes that the parties did not intend to form a joint venture. JDN Overland Park therefore did not consciously undertake a fiduciary duty by way of being involved in a joint venture.

### 2. Implied in Law

Terra Venture next argues that a fiduciary duty existed by virtue of the parties' conduct. Because Defendants controlled every aspect of marketing and developing the property, Terra Venture claims, Defendants controlled Terra Venture and influenced the amount of commissions and earnout fee earned by Terra Venture. Moreover, by excluding Terra Venture from making any decisions reserved for Terra Venture in the agreement, and by making those decisions themselves, Defendants assumed a duty to act on behalf of Terra Venture.

Defendants simply respond that they did not consciously assume fiduciary duties toward Terra Venture, as is evidenced by the relationship between the parties.

Defendants also cite *JDN Development Co. v. Terra Venture, Inc.*, 265 F.Supp.2d 1239 (D.Kan.2003), where Judge Murguia examined a Fee Agreement similar, if not identical, to the one at issue in this case, and determined that JDN did not owe

Terra Venture a fiduciary duty. The court held that "[u]ndoubtedly, parties may deal at arm's length for their mutual profit. It is only when, by their concerted action, they willingly and knowingly act for one another in a manner to impose mutual trust and confidence that a fiduciary relationship arises." *Id.* at 1253.

 The court fails to see how the evidence supports a finding that Defendants consciously assumed fiduciary duties in this case. The evidence indicates that Defendants controlled all aspects of the project, supporting an inference that Defendants were acting in their own financial interests, not Terra Venture's. Moreover, courts will not presume the existence of fiduciary duties, and extend them reluctantly to commercial transactions. *See PulseCard, Inc. v. Discover Card Servs., Inc.,* 917 F.Supp. 1488, 1493 (D.Kan.1996) (citations omitted). Finally, the record does not support the statement that Defendants excluded Terra Venture from making decisions reserved for Terra Venture in the agreement.

For these reasons, the court determines that the evidence does not support a fiduciary relationship implied in law.

### B. Breach of Contract

Terra Venture next claims that when Defendants failed to develop the property in a timely manner, they breached a contract provision, whether written, implied, or oral. For the following reasons, the court disagrees.

#### 1. Written Agreement

The written Fee Agreement does not contain an express requirement that Defendants develop the property. Terra Venture claims that because the agreement contemplates that Defendants will develop the property and because it specifies that "time is of the essence," Defendants had an obligation to develop the property in a timely manner. In support of their argument, Terra Venture cites the portion of the Fee Agreement that provides:

[JDN Overland Park] intends to purchase certain Property (as defined below). In connection with the ownership and development of the Property, [JDN Overland Park] agrees that certain fees may be earned by [Terra Venture] upon the terms and conditions set forth below, and [Terra Venture] agrees to perform certain services in connection with the development of the property.

Terra Venture also claims that an agreement between Defendants and Wal–Mart obligated Defendants to develop the property. Pursuant to the Wal–Mart agreement, Defendants agreed to complete the site development by November 1, 2000, or pay a $2,000 per day penalty. Terra Venture argues that "[f]or [D]efendants to now argue that they had no obligation to develop the property is ridiculous."

Defendants respond that the potential earnout fee was just that—*potential.* It was conditioned on the project earning certain profits. If the profits were not earned, the earnout fee was not payable. Nothing in the written Fee Agreement required Defendants to develop the property such that it would earn profit.

 The court determines that the recitations of the parties' expectations throughout the agreement and the "time is of the essence" clause are insufficient to impose an obligation on Defendants to develop the property in a timely manner. The parties' expectations and the parties' bargained-for obligations are distinct, and the court will not impose an obligation where the contract does not.

The terms of the Wal–Mart agreement do not alter the terms of the Fee Agreement. Whether Defendants owed penal-

ties for late development of a particular site within the property is irrelevant to the dispute at hand.

### 2. Implied Covenant of Good Faith and Fair Dealing

■ Terra Venture next claims that Defendants were obligated to develop the property pursuant to the implied covenant of good faith and fair dealing. Again, the court disagrees.

"[I]n order to prevail on an implied duty of good faith and fair dealing theory under Kansas law, plaintiffs must (1) plead a cause of action for 'breach of contract,' not a separate cause of action for 'breach of duty of good faith,' and (2) point to a term of the contract 'which the defendant allegedly violated by failure to abide by the good faith spirit of that term.'" *Britvic Soft Drinks Ltd. v. ACSIS Techs., Inc.,* 265 F.Supp.2d 1179, 1188 (D.Kan.2003) (citations omitted). "The duty of good faith assumes the existence of a contractual right; it does not create one." *Bank IV Salina, N.A. v. Aetna Cas. & Surety Co.,* 810 F.Supp. 1196, 1204 (D.Kan.1992) (citation omitted). "This implied duty requires the parties to an agreement to refrain from 'intentionally and purposefully do[ing] anything to prevent the other party from carrying out his part of the agreement, or do[ing] anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Kay–Cee Enters., Inc. v. Amoco Oil Co.,* 45 F.Supp.2d 840, 846 (D.Kan.1999) (citation omitted).

■ The flaw in Terra Venture's argument lies in the rule of law that the implied covenant cannot create a contractual right. Because the court has already held that the Fee Agreement did not impose an obligation for Defendants to develop the land, such an obligation cannot be created through application of the implied covenant.

Terra Venture argues that requiring Defendants to timely develop the property was necessary to protect their expectation of an earnout fee. But the earnout fee was not a guaranteed payment. If Terra Venture desired a guaranteed payment, it should have contracted for it.

For the above-stated reasons, the court determines that the implied covenant of good faith and fair dealing did not impose an obligation on Defendants to expeditiously develop the land.

### 3. Oral Agreements

To the extent that Terra Venture is claiming that any oral representations modified the plain language of the contract, the court rejects the argument. Defendants have argued that any such representations are barred by the statute of frauds, the parol evidence rule, and the Fee Agreement's merger clause. In Terra Venture's brief, it responds that Defendants' duty to develop arises from the terms in the Fee Agreement and the implied covenant of good faith and fair dealing. Because the court has already rejected these arguments, and because the parol evidence rule and the merger clause bar the addition of any oral representations as terms in the contract, the court rejects Terra Venture's argument.

### 4. Belle Meade's Conveyances

Terra Venture also argues that Belle Meade breached the Assignment Agreement when it transferred portions of the property without obtaining permission from Terra Venture. Defendants respond that Terra Venture did not suffer damages as a result of the unauthorized transfers. Terra Venture agrees, and clarifies that it merely wants all Defendants to agree to be liable for any damages since they ultimately took title to the property. Because Terra Venture presents no evidence of

damages from this breach, and because the court is granting summary judgment on all other claims, the court also grants summary judgment as to this claim.

### C. Promissory Estoppel

Terra Venture asserts promissory estoppel as an alternative remedy to its breach of contract claim. Because Terra Venture has failed to present evidence of an allowable measure of damages, however, the court grants summary judgment as to this claim.

In order to invoke the doctrine of promissory estoppel, Terra Venture must prove: "(1) The promisor reasonably expected the promisee to act in reliance on the promise; (2) the promisee acted as could be reasonably expected in relying on the promise; and (3) a refusal of the court to enforce the promise would sanction the perpetration of fraud or result in other injustice." *Templeton v. Kan. Parole Bd.,* 27 Kan.App.2d 471, 6 P.3d 910, 913 (2000) (citation omitted); *see also First Bank of Wakeeney v. Moden,* 235 Kan. 260, 681 P.2d 11, 14–15 (1984) ("Promissory estoppel involves both misrepresentation and detrimental reliance."). The court need only look at the detrimental reliance requirement in the instant case, however, because Terra Venture has offered no evidence of damages, or detriment, suffered as a result of its reliance. Terra Venture has only offered evidence of its expectancy damages—lost profits that it expected to earn on the project. There is no evidence before the court of reliance damages—costs that Terra Venture incurred as a result of its reliance on Defendants' alleged promise.

Restatement 2d of Contracts § 90, which "has long been recognized and relied upon by [the Kansas Supreme Court]," sheds some light on whether expectancy damages are allowed for a promissory estoppel claim. *Kirkpatrick v. Seneca Nat'l Bank,* 213 Kan. 61, 515 P.2d 781, 786 (1973). Although comment d to the Restatement indicates that relief other than restitution may sometimes be appropriate, Illustrations 8 and 10 both instruct that expectancy damages would not be recoverable in the instant case:

8. A applies to B, a distributor of radios manufactured by C, for a "dealer franchise" to sell C's products. Such franchises are revocable at will. B erroneously informs A that C has accepted the application and will soon award the franchise, that A can proceed to employ salesmen and solicit orders, and that A will receive an initial delivery of at least 30 radios. A expends $1,150 in preparing to do business, but does not receive the franchise or any radios. B is liable to A for the $1,150 but not for the lost profit on 30 radios.

10. A, who owns and operates a bakery, desires to go into the grocery business. He approaches B, a franchisor of supermarkets. B states to A that for $18,000 B will establish A in a store. B also advises A to move to another town and buy a small grocery to gain experience. A does so. Later B advises A to sell the grocery, which A does, taking a capital loss and foregoing expected profits from the summer tourist trade. B also advises A to sell his bakery to raise capital for the supermarket franchise, saying "Everything is ready to go. Get your money together and we are set." A sells the bakery taking a capital loss on this sale as well. Still later, B tells A that considerably more than an $18,000 investment will be needed, and the negotiations between the parties collapse. At the point of collapse many details of the proposed agreement between the parties are unresolved. The assurances from B to A are promises on which B reasonably should have expected A to rely, and A is entitled to his actual loss-

es on the sales of the bakery and grocery and for his moving and temporary living expenses. Since the proposed agreement was never made, however, A is not entitled to lost profits from the sale of the grocery or to his expectation interest in the proposed franchise from B.

The court also has some direction from the Kansas Supreme Court on the way it might decide this case. In *Ritchie Paving, Inc. v. City of Deerfield, Kan.*, 275 Kan. 631, 67 P.3d 843 (2003), the court considered whether an unsuccessful low bidder on a public works project could recover on a promissory estoppel theory, when the municipality made its decision based on factors not disclosed to the bidders. The court held that the low bidder could recover, but that its damages were limited to its costs in preparing and submitting a bid. *Id.* at 850. Anticipated profits were not recoverable. *Id.* at 849.

Similarly, the Tenth Circuit, interpreting Kansas law, held in an unpublished opinion that a former employee could not recover "termination" damages under a promissory estoppel theory. *Collins v. Old Republic Title Co. of Kansas City, Inc.*, No. 97–3255, 1998 WL 892282, at *2 (10th Cir. Dec.23, 1998). The plaintiff in *Collins* alleged that she had suffered lost employment benefits, including lost wages and retirement benefits, and the cost of increased health insurance premiums as the result of her termination. *Id.* The plaintiff's work-related acts were the subject of a lawsuit against the employer, and in order to induce her to defend the lawsuit, her employer had promised that it would not terminate her employment until the conclusion of the lawsuit. *Id.* at *1. When the employer terminated the plaintiff's employment prior to the completion of the lawsuit, the plaintiff brought an action for promissory estoppel. *Id.* The Tenth Circuit observed in a footnote that the only damages the plaintiff sustained in reliance upon the promise of continued employment were the litigation costs she incurred. *Id.* at *2, n. 2. The other damages the plaintiff sought were not a result of her detrimental reliance on the employer's promise.

Based on this law, the court concludes that Terra Venture cannot recover expectancy damages under the theory of promissory estoppel. Terra Venture has offered no evidence of reliance damages, or the value of services provided above and beyond those for which it has already been compensated. Without such evidence, there is no issue to present to a jury.

### D. Claim for Leasing Commissions

TV Realty claims that it is due lost leasing commissions even though it was not a party to an agreement with Defendants because the parties acted as if there were a contractual relationship between them. The claim for lost leasing commissions is again based on the premise that Defendants had a duty to develop the property in a timely manner. Because the court has determined that Defendants did not agree to assume such a duty, this claim must also fail.

To the extent that TV Realty is claiming that it provided services worth more than the $250,000 that Defendants have already paid, the court dismisses the claim because TV Realty has presented no evidence of additional services or damages sustained.

### E. Auto Mall Damages

Terra Venture and TV Realty seek lost profits in the amount of $1.9 million, alleging that Defendants were to transfer a portion of the property to Terra Venture to develop an auto mall. $1.9 million is the amount Terra Venture expected to earn through the future development of the auto mall. The parties never signed a

written contract regarding the auto mall, although Terra Venture presented one to Defendants that Defendants refused to sign.

The auto mall claim is based on the oral representations of Defendants, the conduct of Defendants after Terra Venture tendered a contract to them, and the existence of the auto mall in the pro forma. Implicitly acknowledging that the statute of frauds would bar evidence of the oral representations, Plaintiffs argue that exceptions to the statute of frauds, either an implied-in-fact contract theory or promissory estoppel, apply.

 Plaintiffs have failed to present evidence sufficient to allow it to proceed on an equitable theory. "In order to recover on a theory of promissory estoppel, the [plaintiff] must establish that [it] entered into an otherwise valid and enforceable contract with [the defendant]...." *Bittel v. Farm Credit Servs. of Cent. Kan.*, 265 Kan. 651, 962 P.2d 491, 499 (1998). There is no evidence before the court that the parties ever agreed on a price for the property or any other specific terms. Absent such evidence, the court cannot recognize either an implied-in-fact contract or a valid promissory estoppel claim.

### F. Claim for an Accounting

Because the court has granted summary judgment with respect to all of Plaintiffs' other claims, there is no cause of action for an accounting. The court also grants summary judgment as to this claim.

In sum, the court grants summary judgment as to all of Plaintiffs' claims. The court has fully considered all of the parties' arguments, even if not addressed within this Memorandum and Order. Several arguments have been rendered moot by the court's rulings.

Although the court has granted summary judgment with respect to all of Plain-

tiffs' claims, the case remains pending with respect to Defendants' counterclaims.

IT IS, THEREFORE, BY THE COURT ORDERED that Defendants' motion for summary judgment (Doc. 195) is granted.

Copies or notice of this order shall be transmitted to counsel of record.

**IT IS SO ORDERED.**