NOT DESIGNATED FOR PUBLICATION

No. 115,179

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

KYLE WHITE and SHARENE WHITE,
*Appellants*,

v.

SECURITY STATE BANK and MARTIN PECK,
*Appellees*.


MEMORANDUM OPINION

Appeal from Sumner District Court; WILLIAM F. LYLE, JR., judge. Opinion filed November 17, 2017. Affirmed in part, reversed in part, and remanded.

*Aaron J. Good*, of Klenda Austerman, LLC, of Wichita, for appellants.

*Timothy A. Shultz*, of Goodell Stratton Edmonds & Palmer LLP, of Topeka, for appellees.

Before BUSER, P.J., PIERRON and STANDRIDGE, JJ.

BUSER, J.: Kyle and Sharene White (collectively the Whites) appeal the district court's dismissal of their petition against Security State Bank and Martin Peck, the president of Security State Bank (collectively the Bank). The petition was filed because of a dispute over a note and mortgage transaction between the parties. Upon the filing of the Bank's motion to dismiss the petition, briefing, and a hearing, the district court ruled that the Whites had failed to state a claim for relief as to each of the six claims. As a result, the district court dismissed the petition.

1

Upon our review, we conclude the district court erred in dismissing five of the six claims in the petition. Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

Because the district court dismissed the petition based on its review of the claims and facts stated in the petition, we view those well-pleaded facts in a light most favorable to the Whites and assume as true those facts and any inferences reasonably drawn from them. See *Cohen v. Battaglia*, 296 Kan. 542, 545-46, 293 P.3d 752 (2013). As a result, this factual background and other facts referenced in the analysis sections are derived from the Whites' petition. The procedural background is summarized from the record on appeal.

In August 2006, the Whites moved to Sumner County, Kansas, to help work on the White family farm (White Farms). White Farms consists of about 700 acres of farmland. The Whites had no farming experience. After Kyle's father died in January 2010, Kyle received a one-fifth undivided interest in White Farms. The Whites and Keel White took over the farming operation.

The following month, in February 2010, the Whites approached the Bank to arrange financing for their farming enterprise. According to the Whites:

> "As novice farmers, [they] relied upon [the Bank's] advice and recommendations
> regarding their farming operations, including but not limited to opening checking
> accounts, lines of credit, and other banking matters, obtaining specialized crop insurance,
> and methods for increasing overall crop yields, including the application of fertilizer."

In the years after the initial farm financing was secured, the Whites had difficulty paying down their lines of credit with the Bank. In the spring of 2013, the Bank

2

suggested "consolidating and securing the unpaid principal and interest from their lines of credit." The Whites, together with other family members who controlled the remaining interests in about 300 acres of farmland, agreed to pledge as collateral an entire, undivided interest in the 300 acres of farmland referred to as "Section 9." This agreement was memorialized in a document entitled, "First Addendum to Family Settlement Agreement" (First Addendum) that identified Section 9 in specific detail.

The Whites communicated to the Bank their intent to mortgage Section 9 to secure the unpaid principal and interest on their lines of credit, and the First Addendum was delivered to the Bank in January 2014. The parties agreed "the Mortgage would encumber the entire, undivided interest in Section 9" as set forth in the First Addendum. The Bank agreed to accept Section 9 as collateral, commissioned an appraisal, and caused a title insurance policy to be issued on it. According to the petition, "[a]t no time did the Whites discuss encumbering any other property they held an ownership interest in with [the Bank] or Peck."

In January 2014, the Bank prepared the mortgage and note for the transaction. The mortgage provided that it secured a promissory note or other agreement dated January 22, 2014, in an amount of $557,840. In late January, the Whites signed the mortgage and note. On February 12, 2014, the Bank recorded the mortgage.

According to the petition, the Bank unilaterally changed the terms of the mortgage without the knowledge or consent of the Whites. This modification resulted in the mortgage encumbering the Whites' undivided one-fifth interest in *all* the White Farms farmland. The Whites, who describe themselves as "not sophisticated businessmen," claimed they "did not realize until months later that [the Bank] and or Peck had changed the terms of the Mortgage."

3

About July 29, 2014, a Bank representative informed the Whites that the mortgage encumbered their entire undivided one-fifth interest in *all* of the White Farms farmland and not an entire, undivided interest in Section 9 as the parties had agreed. According to the petition, the Whites "brought the unauthorized mortgage to [the Bank's] attention" but the Bank ignored their concerns.

A dispute also arose between the parties regarding the Bank's unauthorized transaction of charging $32,000 against the Whites' line of credit, the Bank's refunding of the money, but requiring the Whites to take out a new $32,000 loan to pay the previously accrued interest. Moreover, although the Whites' agreements with the Bank required the Bank to apply the Whites' payments made toward their lines of credit and to debts specified by the Whites, the Bank, without authorization, applied these payments to the $32,000 loan. The Bank informed the Whites that these actions were taken because "it was 'illegal' to pay down their lines of credit when they had other loans with [the Bank] that had outstanding balances."

Subsequently, the Bank declined to process some of the Whites' transactions and in late December 2014, the Bank informed the Whites that it would not renew their lines of credit for the following year because they "did not have zero balances at the end of the year." However, at that time, according to the Whites, they were current on their loans with the Bank including the principal note. Subsequently, the Bank reported to various credit reporting agencies that the Whites' loans were "past due."

According to the petition, the Bank "told the Whites to sell their undivided 1/5 interest in the White Farms farmland" and "use the proceeds of that sale to pay down their lines of credits and other debts with [the Bank]." The Whites refused.

Keel White, Kyle' brother, also has an undivided one-fifth interest in White Farms' farmland. The Bank wanted Keel to purchase the Whites' one-fifth interest in order to

4

satisfy the Whites' mortgage and note. To accomplish this transaction, the Bank "threatened it would not renew Keel White's lines of credit." According to the petition, "[f]ailing to renew Keel White's lines of credit would make it difficult, if not impossible for Keel to pay his agricultural operating expenses and continue farming." Additionally, by holding "Keel White's lines of credit hostage in an attempt to force him to buy the White's 1/5 White Farms interest encumbered by the Mortgage and Note . . . would allow [the Bank and Peck] to whitewash their illegal substitution of the mortgaged property."

Additionally, the petition stated that the Bank attempted to have Keel harvest the Whites' wheat crop and report the wheat as its own. This action was sought by the Bank over concern that the Whites would be unable to harvest the crop and, as a result, the Bank would lose the value of the collateral.

With regard to Peck's involvement with White Farms, the petition asserted that at all relevant times Peck was acting as an agent for the Bank and for the benefit of and on behalf of the Bank. Moreover, the Bank ratified Peck's actions. Finally, the petition stated that the Bank had engaged in a pattern of "unconscionable, deceptive, and fraudulent behavior" to exploit the Whites.

On July 22, 2015, the Whites filed the petition that is the subject of this appeal. The pleading asserted six claims against the Bank: (1) breach of contract, due to unilateral mistake; (2) Kansas Consumer Protection Act violations; (3) breach of fiduciary duty; (4) fraud; (5) negligent misrepresentation; and (6) slander of title. On September 15, 2015, the Bank filed a motion to dismiss the petition.

On November 4, 2015, the district court held a hearing on the Bank's motion to dismiss. A transcript of the hearing was not included in the record on appeal. On November 25, 2015, the district court filed a memorandum opinion granting the Bank's motion and dismissing the petition. It subsequently filed a journal entry of dismissal.

5

On January 12, 2016, the Whites filed this appeal. On May 31, 2016, Keel White filed a motion with our court seeking a voluntary dismissal of him from the appeal. Keel's motion was granted.

STANDARDS OF REVIEW AND PRINCIPLES OF LAW REGARDING MOTIONS TO DISMISS

Whether a district court erred by granting a motion to dismiss a petition is a question of law subject to unlimited appellate review. Moreover, if the dismissal involves interpretation of a statute, an appellate court has unlimited review over the district court's statutory construction. *Knop v. Gardner Edgerton U.S.D. No. 231*, 41 Kan. App. 2d 698, 709, 205 P.3d 755 (2009).

In our review of a motion to dismiss, the appellate court will consider the well-pleaded facts in a light most favorable to the plaintiff and assume as true those facts and any inferences reasonably drawn from them. If those facts and inferences state *any* claim upon which relief can be granted, then dismissal is improper. *Cohen*, 296 Kan. at 545-46. Dismissal is proper only when the allegations in the petition clearly demonstrate that the plaintiff does not have a claim. *Halley v. Barnabe*, 271 Kan. 652, 656, 24 P.3d 140 (2001) (citing *Ripley v. Tolbert*, 260 Kan. 491, 493, 921 P.2d 1210 [1996], and *Bruggeman v. Schimke*, 239 Kan. 245, 247-48, 718 P.2d 635 [1986]).

Kansas is a notice pleading state. See *T.H. and C.C. v. University of Kansas Hosp. Auth.*, 53 Kan. App. 2d 332, 338, 388 P.3d 181 (2017). This means that in drafting a petition the plaintiff need only include a

> "'short and plain statement of the claim showing that the pleader is entitled to relief.'
> *Montoy v. State*, 275 Kan. 145, 148, 62 P.3d 228 (2003); see also K.S.A. [2016] Supp.
> 60-208(a)(1). The petition is to be liberally construed by the district court which is
> 'required to draw any reasonable inferences from [the facts pled] and determine whether
> the facts and inferences state a claim . . . on any possible theory the court can divine.'

*Nungesser*, 283 Kan. at 559. Liberal construction of the pleading is meant to allow 'a pleader to shift the theory of his case as the facts develop, as long as he has fairly informed his opponent of the transaction or the aggregate of the operative facts involved in the litigation.' *Montoy*, 275 Kan. at 149." *T.H. and C.C.*, 53 Kan. App. 2d at 338.

Importantly, the petition does not "'govern the entire course of the case. Rather, the ultimate legal issues and theories on which the case will be decided are reduced to writing . . . [after] the close of discovery' when the parties have had an opportunity to fully develop their cases. *Nungesser*, 283 Kan. at 559." *T.H. and C.C.*, 53 Kan. App. 2d at 338. For this reason, "judicial skepticism must be exercised" when a defendant moves to dismiss the petition "before the completion of discovery." *Rector v. Tatham*, 287 Kan. 230, 232, 196 P.3d 364 (2008).

As mentioned earlier, the Whites' petition included six separate counts or claims. We will consider each claim individually.

### BREACH OF CONTRACT BASED ON UNILATERAL MISTAKE

In Count I of the petition, the Whites alleged a breach of contract claim based on unilateral mistake. In particular, the Whites asserted the mortgage and note were contracts in which there was a mistake regarding the real property that was to be mortgaged. According to the Whites, the Bank "caused, knew of, or had reason to know of, this mistake." Based on this unilateral mistake, the Whites sought reformation of the mortgage and note.

The district judge did not rule on this claim specifically, but in its memorandum opinion stated: "The [Whites'] case, in my opinion, arises out of the claims that the wrong property was mortgaged in the note which they signed. The [Whites] seem to admit that they failed to read and understand the terms of the contract with the bank prior to signing."

7

On appeal, the Whites argue the "core premise" of their petition is that they made a "mistake" by executing the mortgage and note "that did not reflect the parties' agreement to encumber Section 9." Moreover, "[w]hile the Whites were unaware of the change in the property to be encumbered, they clearly allege [the Bank] knew or had reason to know of the mistake or caused the mistake." Read together, the Whites assert the Bank "acted fraudulently and inequitably by unilaterally changing the legal description of the encumbered property." Citing *Andres v. Claassen*, 238 Kan. 732, 714 P.2d 963 (1986), the Whites assert that "[s]uch fraud and inequitable action is the very basis for a claim of unilateral mistake."

We begin our analysis with the Kansas pattern instruction for unilateral mistake which summarizes the basis for the claim: "A party may be relieved of contractual responsibility if that party made a mistake concerning a basic assumption or material fact upon which the contract was based, and the other party to the contract (*knew of that mistake*) (*had reason to know of the mistake*) (*caused the mistake*)." PIK Civ. 4th 124.05(B). In this litigation, the Whites' assertion that they were mistaken concerning the extent of the farmland that was pledged as collateral and that this mistake was known, should have been known, or was caused by the Bank, would appear to constitute the essence of a unilateral mistake claim.

The Bank does not cite or discuss *Andres*. We are persuaded, however, that *Andres* provides valuable precedent to support the legal basis for the Whites' claim. In 2011, our court summarized the facts in *Andres*:

> "[T]he Andres wanted to sell real estate to Claassen. After negotiating with Claassen over the selling price of a particular piece of real estate, the Andres drafted a real estate contract, which was then presented to Claassen for review. Claassen reviewed the contract and added a provision stating that the sale would include a portion of real estate that had never been discussed by the parties. The Andres signed the contract, which unambiguously included the provision providing the sale would include the additional

8

real estate. On appeal, the district court found that the Andres did not intend to transfer the extra real estate despite Claassen's testimony to the contrary. The district court reformed the contract to exclude the provision added by Claassen." *Crawford v. Davidson*, No. 103,939, 2011 WL 6382746, at * 3 (Kan. App. 2011) (unpublished opinion).

In *Andres*, our Supreme Court, applied the following statement of law to the unique facts of the real estate transaction:

> "It has long been the law that a written instrument may be reformed where there is ignorance or a mistake on one side and fraud or inequitable conduct on the other, as where one party to an instrument has made a mistake and the other knows it and fails to inform him of the mistake or conceals the truth from him. Where, unknown to one of the parties, an instrument contains a mistake rendering it at variance with the prior understanding and agreement of the parties, and the other party learns of this mistake at the time of the execution of the instrument and later seeks to take advantage of it, equity will reform the instrument so as to make it conform to the prior understanding. Thus, unilateral mistake may be the basis for relief when it is accompanied by the fraud of, or is known to, the other party. [Citation omitted.]
>
> "The Kansas cases have long adhered to the principle that an instrument may be reformed where there is ignorance or mistake on one side and fraud or inequitable conduct on the other. Silence by one party to a contract, with knowledge that the other party is mistaken and that the instrument as written does not express the true intention of the parties, may constitute a misrepresentation amounting to constructive fraud." 238 Kan. at 740.

In this case on appeal, similar to *Andres*, the Whites allege that, unbeknownst to them, the Bank included more farmland as collateral to the mortgage than they had previously agreed to. Moreover, as in *Andres*, the legal description of the farmland was conspicuous in the contract before being signed by the Whites.

9

In response to the Whites' argument, the Bank relies on *Albers v. Nelson*, 248 Kan. 575, 578-79, 809 P.2d 1194 (1991), for the proposition that failing to read a contract is not grounds for reformation based on a unilateral mistake.

In our view, *Albers* is distinguishable. Although in this case the district court found the Whites "seem to admit that they failed to read and understand the terms of the contract," the petition makes no such assertion. Obviously, a party may read but mistakenly understand the terms of a contract. Moreover, *Albers* is also distinguishable because the Whites allege inequitable conduct by the Bank, while in *Albers* there was no evidence of inequitable conduct. Because we are reviewing the petition in the context of a motion to dismiss, we must assume the Whites' allegations of inequitable conduct are true. *Cohen*, 296 Kan. at 545-46.

Consonant with our Supreme Court's precedent in *Andres*, our court has also set forth the essential elements of a breach of contract based on a unilateral mistake:

> "[A] written instrument may be reformed where there is ignorance or mistake on one side
> and fraud or inequitable conduct on the other; this can occur where one party to an
> instrument has made a mistake and the other knows it and fails to inform him or her of
> the mistake or conceals the truth from him or her. In addition, an instrument prepared by
> one party not in accord with a prior agreement of the parties as to its terms, when
> executed by the other without observing the mistake in the instrument, may be reformed
> where it is clearly shown one party was mistaken and the other party acted inequitably.
> [Citations omitted.]" *Jones v. Reliable Security, Inc.*, 29 Kan. App. 2d 617, 633, 28 P.3d
> 1051 (2001).

The precedent established in *Jones* mirrors *Andres* and clearly encompasses a factual situation similar to the one alleged in the Whites' petition. We conclude the Whites have alleged sufficient facts to make a breach of contract claim based on a

unilateral mistake. Given Kansas' notice pleading standards, the district court erred in dismissing this claim.

KANSAS CONSUMER PROTECTION ACT

In Count II of the petition, the Whites assert 14 separate deceptive and/or unconscionable acts in violation of the Kansas Consumer Protection Act (KCPA), K.S.A. 2016 Supp. 50-623 et seq. The KCPA is designed, in part, to "protect consumers from suppliers who commit deceptive and unconscionable practices." K.S.A. 50-623(b).

To prevail on a KCPA claim, a plaintiff must prove that "(1) plaintiffs were consumers under the KCPA, (2) *defendants were suppliers under the KCPA,* (3) defendants engaged in a deceptive or unconscionable act or practice in violation of K.S.A. § 50-626 . . . or K.S.A. § 50-627, and (4) plaintiffs were 'aggrieved' by such act." (Emphasis added.) *In re Motor Fuel Temperature Sales Practices Litig.*, 279 F.R.D. 598, 604-05 (D. Kan. 2012).

The KCPA defines a supplier as "a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the customer." K.S.A. 2016 Supp. 50-624(l). The same section of the statute, however, excludes any bank "which is subject to state or federal regulation with regard to disposition of repossessed collateral by such bank . . . ." K.S.A. 2016 Supp. 50-624(l).

Critical to the issue on appeal, to successfully make a claim under the KCPA, a plaintiff must prove that the defendant is a supplier under the KCPA. K.S.A. 2016 Supp. 50-626; K.S.A. 50-627; also see *Alexander v. Certified Master Builders Corp.*, 268 Kan. 812, 825, 1 P.3d 899 (2000) (noting that only a supplier as defined in K.S.A. 2016 Supp. 50-624[l] is subject to the KCPA).

11

In dismissing this claim, the district court ruled the KCPA "does not apply in this case as the bank is clearly not a supplier, but rather, a regulated supplier." As a result, the district court determined that the Bank was excluded from the KCPA's definition of a supplier.

On appeal, there is no disagreement that the Bank is regulated. The critical issue is whether the exclusion in the KCPA for regulated banks applies to the Whites' loan transaction since there was no repossessed collateral at issue. If the district court's statutory interpretation is correct, the Whites were precluded from making a claim against the Bank under the KCPA.

On appeal, the Whites challenge the district court's legal conclusion and argue that the exclusion of banks from the definition of suppliers is expressly limited to only those occasions when the bank is actually disposing of repossessed collateral. On the other hand, the Bank takes a broader approach and argues that the KCPA exclusion applies whenever a regulated bank is involved in any transaction, regardless of whether that matter involves disposing of repossessed collateral. The Bank surmises that regulated banks must comply with federal and state regulations which protect consumers from "'deceptive and unconscionable practices'" by banks. In the view of the Bank, the KCPA's exclusion of regulated banks as suppliers is a recognition that consumers receive protection from other statutory or regulated sources.

As mentioned previously, if the dismissal of a petition involves interpretation of a statute, we have unlimited review over the district court's statutory construction. *Knop*, 41 Kan. App. 2d at 709. Moreover, when a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016). The dispositive language for our review is whether under the facts as alleged in the petition the Bank is

12

"subject to state or federal regulation with regard to disposition of repossessed collateral . . . ." K.S.A. 2016 Supp. 50-624(l).

A plain reading of the statutory language persuades us that the interpretation proposed by the Whites is too narrow. The basic text of the supplier exclusion does not limit its application to only those times when the bank is actively disposing of repossessed collateral. Rather, based on the plain language, if a bank is generally subject to regulations pertaining to disposition of repossessed collateral, the bank is excluded as a supplier under the nomenclature and reach of the KCPA.

The Whites point out that our court in *Khan v. Denison State Bank*, No. 113,248, 2016 WL 687728 (Kan. App. 2016) (unpublished opinion), ruled that a bank which sold real estate was a supplier under the KCPA because it did not repossess the property it sold, but rather repurchased it as part of a settlement of a lawsuit the property owner had against the bank. 2016 WL 687728, at *8.

From our reading of *Khan*, however, it is unclear whether the issue of statutory construction which is presented to our court in this case was raised before our court in *Khan*. On the contrary, it appears the bank's argument was that the property at issue in *Khan* was, in fact, repossessed property which put the bank squarely within the ambit of the exclusion. Khan, on the other hand, challenged that characterization and argued that the property was not repossessed property but simply property obtained by the bank as part of a civil settlement. In other words, it does not appear the bank ever broadly argued (as the Bank contends here) that it should come under the KCPA exclusion simply because it was, in a general sense, a regulated bank in matters relating to the disposition of repossessed collateral. In short, we question whether *Khan* really addressed the legal issue before us in this appeal.

13

Additionally, our court's holding in *Khan* was brief, without any statutory interpretation of K.S.A. 2016 Supp. 50-624(l), and limited to a review of the district court's factual determination that the property in question was collateral. See 2016 WL 687728. Given these circumstances and given that unpublished opinions are not binding precedent and are only cited for persuasive authority, we do not consider *Khan*'s ruling dispositive or persuasive on the particular legal question before us in this appeal. See Kansas Supreme Court Rule 7.04(g)(2)(A) and (B) (2017 Kan. S. Ct. R. 45).

We find support for our plain reading interpretation of the supplier exclusion found in K.S.A. 2016 Supp. 50-624(l) from two recent opinions issued by the United States District Court for the District of Kansas. In *In re Larkin*, 553 B.R. 428, 444 (Bankr. D. Kan. 2016), the district court surveyed the myriad of cases from the District Court for Kansas and observed:  "In every instance where a bank's status as 'supplier' under the KCPA was directly before it, the United States District Courts have held that regulated banks are excluded from the definition, regardless of whether the case actually involves a disposition of repossessed collateral."

In interpreting the exclusionary language, the district judge in *In re Larkin* observed:

> "Wittingly or not, the Legislature has created a sizeable hole in the KCPA through which banks . . . can slip, regardless of their conduct. While the 'guiding principle' of the KCPA is to protect consumers from suppliers who commit deceptive and unconscionable acts, a goal that requires liberal construction, that only goes as far as the words that are contained in the statute. I cannot interpret words that aren't there or replace them with others. Adopting the Larkins' interpretation would effectively rewrite the 'regulated bank' exclusion in the definition of 'supplier.' That is a task for the Kansas Legislature, not me." 553 B.R. at 444-45.

14

The federal district court in *In re Larkin* relied on *Kalebaugh v. Cohen, McNeile & Pappas, P.C.*, 76 F. Supp. 3d 1251 (D. Kan. 2015). In *Kalebaugh*, the district court was presented with the following scenario:

> "[D]efendant argues that the alleged supplier, Discover Bank, *cannot* be deemed as such under the KCPA's own definition of that term.
>
> . . . .
>
> "Plaintiff disagrees with this interpretation of the definition of 'supplier' and instead argues that the KCPA only excludes banks . . . when the issue at hand is the 'disposition of repossessed collateral.' Ergo, since the issue before the court deals only with the alleged outstanding balance on a credit card and *not* the disposition of repossessed collateral, Discover Bank is a supplier under the KCPA." 76 F. Supp. 3d at 1260.

In ruling in favor of Discover Bank, the district court rejected the plaintiffs' argument that the application of the regulated bank exclusionary language only applied in cases involving the disposition of repossessed collateral. The district court disagreed with such a narrow reading and concluded, "The court cannot extrapolate this meaning from the plain language of the statute. The court therefore concludes that Discover Bank is *not* a supplier under the KCPA if it is subject to state or federal regulation." 76 F. Supp. 3d at 1260.

We are persuaded that the plain, common sense reading of the exclusionary language of K.S.A. 2016 Supp. 50-624(l), as discussed in *Larkin* and *Kalebaugh*, is the proper approach to understanding the legislature's meaning in drafting this particular statutory provision. Because we conclude, as a matter of law, that the Bank was not a supplier for purposes of the KCPA, we find no error in the district court's dismissal of this claim.

15

In their petition, the Whites alleged that they engaged in a business relationship with the Bank "in which the Whites placed special trust and confidence." As a result, the Whites asserted that the Bank was bound "by equity and good conscience" to carry out their interests, including applying all funds and collateral including crops towards debts allegedly owed by the Whites. Additionally, the Whites claimed a breach of fiduciary duty by the Bank when it mortgaged their property which "it knew, or had reason to know, the Whites did not intend to mortgage." Finally, the Whites alleged a breach when the Bank attempted to conspire with Keel to deprive the Whites of collateral in the form of wheat crops.

In dismissing this claim, the district court found:  "The bank was not in a fiduciary relationship with the [Whites] merely by giving farming advice. Neither did the [Whites] support a claim for fraud. . . . The [Whites] failed to read and understand the terms of the contract they signed."

On appeal, the Whites contend the district court erred in not considering their allegations as true, but instead, the court erroneously resolved factual issues in favor of the Bank. The Whites, citing *Rector*, emphasize that factual disputes may not be resolved or decided on a motion to dismiss for failure to state a claim.

In response, the Bank argues that, as a general rule of Kansas law, there is no fiduciary relationship between a bank and its customer, and "there were no allegations in the Petition which would justify departing from this well-established rule." The Bank also points out that the Whites' claims are conclusory and the Bank's advice regarding farming operations does not establish "some special fiduciary relationship."

A claim for breach of fiduciary duty must establish through sufficient allegations that a fiduciary relationship exists between the parties. "A fiduciary relationship exists where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence. [Citation omitted.]" *Reebles, Inc. v. Bank of America, N.A.*, 29 Kan. App. 2d 205, 208, 25 P.3d 871 (2001). Whether a fiduciary relationship exists depends on the facts and circumstances of each case. *Denison State Bank v. Madeira*, 230 Kan. 684, 691, 640 P.2d 1235 (1982).

There are two types of fiduciary relationships: (1) those specifically created by contract such as principal and agent and (2) those implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions. *Wilson v. Wilson*, 37 Kan. App. 2d 564, 576, 154 P.3d 1136 (2007). In the case on appeal, the Whites are asserting the second type of fiduciary relationship.

Examples of a fiduciary relationship include "the acting of one party for another, the exercising of influence by one party over another, the reposing of confidence by one party in another, the inequality of the parties, and the dependence of one party on another. [Citations omitted.]" *Morrison v. Watkins*, 20 Kan. App. 2d 411, 422, 889 P.2d 140 (1995). A party may not "unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held liable as a fiduciary." *Linden Place v. Stanley Bank*, 38 Kan. App. 2d 504, Syl. ¶ 5, 167 P.3d 374 (2007).

As the Bank points out, ordinarily the relationship between a bank and its customer is that of creditor-debtor and not that of a fiduciary. *Denison State Bank*, 230 Kan. at 695; *Dugan v. First Nat'l Bank in Wichita*, 227 Kan. 201, 207, 606 P.2d 1009 (1980).

17

"The existence of a fiduciary relationship between a bank and a customer has arisen under unusual circumstances; usually, the bank had dealt directly with the customer regarding the matters involved in the litigation, and the bank had knowledge of the reliance and confidence of the customer; and in some instances the bank stood to profit from non-disclosure to the customer." 227 Kan. at 208.

We are persuaded that the Whites have pled sufficient facts to establish, in the light most favorable to them, that the Bank established a fiduciary relationship. The district court found that farming advice did not constitute a fiduciary relationship; however, the petition sets forth a relationship that goes beyond the typical bank and customer relationship. Specifically, the Whites pled in paragraphs 12 and 13 of the petition:

"As novice farmers, [they] relied upon [the Bank's] advice and recommendations regarding their farming operations, including but not limited to opening checking accounts, lines of credit, and other banking matters, obtaining specialized crop insurance, and methods for increasing overall crop yields, including the application of fertilizer."

Taken as true, these facts do not suggest an ordinary bank-customer relationship. Rather, the Bank appears to have provided advice regarding banking and farming operations and taken a particular interest in the success of White Farms.

"A fiduciary has the duty to act with good faith and loyalty to advance the interests of the person placing confidence in [the person.]" PIK Civ. 4th 125.02. The Whites allege that an attempt by the Bank to remove collateral from the property improperly, by pressuring a family member to harvest the Whites' crop without their knowledge or consent, and the Bank's alteration of the mortgage contrary to the mortgage agreement with the Whites were breaches of the fiduciary duty owed to them. Applying our standard of review at this early stage of the litigation, we hold the Whites have sufficiently pled

18

that a fiduciary relationship existed and that the Bank breached its fiduciary duties. Accordingly, the district court erred by dismissing this claim.

FRAUD

For the fourth count in their petition, the Whites claim fraud. In particular, the Whites reprise their allegations of malicious and fraudulent conduct regarding the modification to the mortgage which they assert was intentionally concealed from them. The Whites also claim the Bank committed fraud by wrongfully informing them "it was 'illegal' to pay down their lines of credit when they had other [Bank] loans with outstanding balances," and that "it was 'illegal' to borrow funds from one of their [Bank] lines of credit to pay off principal on another [Bank] loan." According to the petition, these and other false representations were statements of existing or material facts which the Bank knew were falsely or recklessly made with the intent to induce the Whites to act upon them. Finally, the Whites asserted that they relied on the false representations and were damaged as a result.

In dismissing this claim, the district court ruled:  "[T]he [Whites'] claim of fraud fails because their claims of reliance on a fraudulent mortgage are considered unreasonable, because of their failure to read and understand the terms of the mortgage they signed."

In Kansas, the essential elements of a fraud claim are:

"(1) The defendant made false representations as a statement of existing and material fact; (2) the defendant knew the representations to be false or made them recklessly without knowledge concerning them; (3) the defendant made the representations intentionally for the purpose of inducing another party to act upon them; (4) the other party reasonably relied and acted upon the representations; and (5) the other party sustained damages by relying upon the representations. . . . A representation is material

19

when it relates to some matter that is so substantial as to influence the party to whom it is made. [Citations omitted.]" *Stechschulte v. Jennings*, 297 Kan. 2, 19-20, 298 P.3d 1083 (2013).

The Bank contends the appellants failed to meet the heightened plea standard for a fraud claim. Specifically, they argue the Whites cannot meet the fourth element of a fraud pleading, as there was no means of reasonably relying on any potential misstatements about the collateral listed in the mortgage because the legal description of the real estate was plainly stated in the mortgage document.

Kansas law provides that conclusory statements that outline the elements of fraud without stating the circumstances constituting the fraud are insufficient for a fraud pleading. *Newcastle Homes v. Thye*, 44 Kan. App. 2d 774, 788-89, 241 P.3d 988 (2010). In this case, however, the Whites have sufficiently pled a fraud claim. As discussed earlier, the claim relating to the intentional adding of additional collateral to the mortgage without the knowledge or consent of the Whites is clearly and specifically set forth in the petition. The Bank drafted the mortgage, and the Whites assert they relied on the Bank's representations regarding this transaction. The modification obviously placed additional collateral at risk in the event of foreclosure.

Moreover, apart from the mortgage transaction, the petition references allegedly fraudulent statements. Specifically, as referenced earlier, the Whites note false statements made by the Bank regarding the illegality of undertaking certain ways of paying off their debt which, as a result, adversely impacted the Whites' credit situation with the Bank. Additionally, the Bank directed the Whites to sell their interest in White Farms in order to pay down their lines of credit and other debts.

Viewing the facts in a light most favorable to the Whites and assuming as true those facts and inferences reasonably drawn from them, we find the district court erred in

20

ruling that the Whites did not state a sufficient claim for fraud. See *Cohen*, 296 Kan. at 545-46.

NEGLIGENT MISREPRESENTATION

Similar to their fraud claim, the Whites also brought a negligent misrepresentation claim. This claim alleged the communication of false information regarding the note and mortgage, and statements made about the illegality of certain transactions the Whites endeavored to accomplish in order to pay off their financial obligations to the Bank. The Whites asserted that the Bank "failed to exercise reasonable care or competence in communicating this information" to them and that the Whites relied on the false information and were damaged as a result.

In dismissing this claim, the district court found the Whites' allegation "totally relies on a statement of future intent and not a statement misrepresenting factual, commercial information." The district court did not identify the statement at issue.

A person who, in the course of any transaction in which he or she has a pecuniary interest, supplies false information for the guidance of another person is liable for damages suffered by such other person caused by reasonable reliance upon the false information if: (1) the person supplying the false information failed to exercise reasonable care or competence in obtaining or communicating the false information; (2) the person who relies upon the information is the person for whose benefit and guidance the information is supplied; and (3) the damages are suffered in a transaction that the person supplying the information intends to influence. See *Mahler v. Keenan Real Estate, Inc.*, 255 Kan. 593, 604, 876 P.2d 609 (1994); PIK Civ. 4th 127.43. Negligent misrepresentation addresses negligence of knowledge of material fact and the transmittal of already known material facts. See *Stechschulte*, 297 Kan. at 23; *Mahler*, 255 Kan. at

21

604 (quoting *Huttegger v. Davis*, 599 S.W.2d 506, 514 [Mo. 1980] [Welliver, J., dissenting]).

The Bank, citing *Stechschulte*, 297 Kan. at 22, acknowledges that negligent misrepresentation is similar to fraud, except that fraud requires proof that the speaker knew the statements were untrue or was reckless as to whether the statements were true or false. Quoting *Wilkinson v. Shoney's, Inc.*, 269 Kan. 194, 218, 4 P.3d 1149 (2000), the Bank states negligent misrepresentation requires only a showing that the speaker did not "'exercise reasonable care or competence to obtain or communicate truthful information.'" As the district court noted, negligent misrepresentation does not apply to statements of future intent. *Wilkinson*, 296 Kan. at 218.

On appeal, the Whites focus on the allegedly false statements made to them regarding how the Whites could not conduct certain transactions in order to pay off their financial obligations to the Bank. They argue that the Bank's communicated refusal to allow the Whites to pay down their lines of credit and borrow funds was not an expression of future intent as suggested by the district court. Rather, the false commercial information the Whites complain about was that the Bank could not accept the manner of payment proffered by the Whites to address their indebtedness. These statements made in the ordinary course of business related to commercial information relevant to the current indebtedness of the Whites, not, as the district court apparently found, statements about what the Bank intended to do in the future. Because the Whites also met the additional requirements of a negligent misrepresentation claim, the district court erred in dismissing this claim.

SLANDER OF TITLE

For their sixth and final count in the petition, the Whites asserted that the Bank made "the unilateral and unauthorized decision to add all of the Whites' undivided 1/5

22

interest in the White Farms farmland to the Mortgage." Given this fraudulent act, the Bank's filing of the mortgage as a public record constituted an "improper and defective slander of the Whites' title to the 1/5 interest in the White Farms farmland," which damaged the Whites.

In dismissing this claim, the district court ruled: "The [B]ank's filing of the mortgage, which [the Whites] failed to read, falls well short of slander of title. Once the mortgage was signed, the bank was acting within its right to secure its interest."

Slander of title is defined as a "'false and malicious statement, oral or written, made in disparagement of a person's title to real or personal property, causing him injury.' [Citation omitted.]" *Saddlewood Downs v. Holland Corp. Inc.*, 33 Kan. App. 2d 185, 198, 99 P.3d 640 (2004).

On appeal, the Whites assert the district court erred because "the District Court was obligated to accept [their] allegations as true. Instead, the District Court appears to have accepted as true [the Bank's] representation that it was simply trying to 'secure what it believed to be a valid interest in its collateral.'"

For its part, the Bank makes two arguments. First, it asserts that the Bank was rightfully filing the mortgage in order "to secure what it believed to be a valid interest in its collateral." On this point, the Whites have the better argument. The Whites have claimed fraudulent conduct by the Bank with regard to the mortgage transaction. If true, the filing of the mortgage with additional collateral that was not part of the agreement between the parties constitutes a sufficient basis to state a slander of title claim.

For its second argument, the Bank asserts the slander of title claim was barred by the statute of limitations. Because slander of title is an extension of ordinary slander, K.S.A. 60-514(a) establishes a one-year statute of limitations for slander of title claims.

23

Of particular importance to this argument, the statute of limitations begins to run on the date the plaintiffs discover their title has been slandered. See *LaBarge v. City of Concordia*, 23 Kan. App. 2d 8, 18, 927 P.2d 487 (1996). In their petition, the Whites claim they discovered the modification to the mortgage on July 29, 2014. If true, the Whites filed the underlying suit on July 22, 2015, prior to the expiration of the statute of limitations.

While the Bank argues that the Whites should have learned of the mortgage modification in February 2014 with the result that the statute of limitations expired prior to the filing of the petition, *LaBarge* clearly states the statute of limitations begins to run once the aggrieved party actually learns of the slander. The Bank does not favor us with any Kansas precedent wherein constructive knowledge or presumed knowledge of the slander triggers the running of the statute, and we are unaware of any such precedent.

Once again, we are required to consider the Whites' factual assertions as true. At this early stage of the litigation, given the date that the Whites' contend they first learned of the modification to the mortgage, the slander of title claim was filed within the one-year statute of limitations. The district court erred in dismissing this claim.

In summary, we affirm the district court's dismissal of Count II of the petition relating to the Whites' claim of KCPA violations. We reverse the district court's dismissal of the remaining counts contained in the petition and remand for further proceedings.

Affirmed in part, reversed in part, and remanded for further proceedings.